# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**TRUDI PUCHALSKI,**
　　　　　　**Plaintiff,**


　　**v.**　　　　　　　　　　　　　　　**Case No. 14-C-869**

**CAROLYN W. COLVIN,**
**Acting Commissioner of the Social Security Administration**
　　　　　　**Defendant.**

---

## DECISION AND ORDER

Plaintiff Trudi Puchalski brings this action for judicial review of the Commissioner's denial of her applications for social security disability benefits. The court will reverse a decision to deny benefits only if it lacks the support of substantial evidence in the record or rests on an error of law. See, e.g., Farrell v. Astrue, 692 F.3d 767, 770 (7th Cir. 2012). Substantial evidence means such relevant evidence as a reasonable person might accept as adequate to support a conclusion. Curvin v. Colvin, 778 F.3d 645, 648 (7th Cir. 2015). Under this deferential standard, the court may not re-weigh the evidence or substitute its judgment for the Commissioner's. Pepper v. Colvin, 712 F.3d 351, 362 (7th Cir. 2013). If reasonable minds can differ over whether the claimant is disabled, the court must uphold the decision under review. Shideler v. Astrue, 688 F.3d 306, 310 (7th Cir. 2012). Although the court conducts a critical review of the evidence, considering both the evidence that supports, as well as the evidence that detracts from, the Commissioner's decision, it will uphold the decision so long as the evidence supports it and the Commissioner explains her analysis of the evidence with enough detail and clarity to permit meaningful judicial review. Eichstadt v. Astrue, 534 F.3d 663, 665-

66 (7th Cir. 2008); see also Books v. Chater, 91 F.3d 972, 980 (7th Cir. 1996) (explaining that

the Commissioner need not evaluate in writing every piece of testimony and evidence

presented, but need only sufficiently articulate her assessment of the evidence to assure the

court that she considered the important evidence and to enable the court to trace the path of

her reasoning).

## I. FACTS AND BACKGROUND

### A.      Summary of the Case

In May of 2010, plaintiff filed the instant applications seeking disability insurance benefits

("DIB") and supplemental security income ("SSI").  To be eligible for either DIB or SSI, the

claimant must be "disabled," i.e., unable to engage in any substantial gainful activity by reason

of any medically determinable impairment or combination of impairments that can be expected

to result in death or that has lasted or can be expected to last for a continuous period of not

less than 12 months.  See, e.g., Weatherbee v. Astrue, 649 F.3d 565, 568 (7th Cir. 2011).[1]  The

difference between the two programs is that DIB is payable only if the claimant becomes

---

[1]The agency determines disability pursuant to a five-step sequential analysis.  The first step considers whether the claimant is currently working, i.e., engaging in substantial gainful activity ("SGA").  The second step evaluates whether the claimant suffers from a severe medically determinable impairment or impairments.  The third step compares the impairment(s) to a list of conclusively disabling impairments.  If the impairment meets or equals one of the listed impairments, then the claimant is considered disabled; if not, the evaluation continues. The fourth step assesses the claimant's residual functional capacity ("RFC") and ability to engage in past relevant work.  If the claimant can engage in past relevant work, she is not disabled.  The fifth step assesses the claimant's RFC, as well as her age, education, and work experience to determine whether she can engage in other work.  If the claimant can engage in other work, she is not disabled.  The claimant bears the burden of proof in each of the first four steps.  If she reaches step five, the burden shifts to the government to present evidence establishing that the claimant possesses the RFC to perform work that exists in a significant quantity in the national economy.  The agency often relies on vocational experts to meet this burden.  Id. at 569.

disabled while in "insured status" based on previous earnings, while SSI is payable regardless of the claimant's insured status so long as she satisfies a means test. See, e.g., Phippen v. Astrue, No. 11-C-955, 2012 U.S. Dist. LEXIS 66068, at *4 n.1 (E.D. Wis. May 11, 2012); see also 20 C.F.R. 416.335.

Here, plaintiff alleged a disability onset date of January 15, 2008, and the Social Security Administration ("SSA") determined that her date last insured for DIB purposes was June 30, 2009. The case therefore involves two different periods – January 15, 2008, through June 30, 2009, and June 30, 2009, through the date of the agency's decision.

Vocationally, plaintiff reported certification as a CNA in 1999 and LPN in 2004, and past employment as bartender, child-care provider, nurse graduate, and CNA. (Tr. at 244.) She alleged that she could no longer work based on a number of impairments, including back, neck, and knee pain, diabetes, and depression, and the agency collected plaintiff's medical records dating back to January 2008. I first review plaintiff's medical history before turning to the procedural history of the case.

## B. Medical Evidence

On January 16, 2008, plaintiff saw Dr. David Pierce, a psychiatrist, for treatment of ADHD (attention deficit hyperactivity disorder) and adjustment disorder with mixed mood. She was at the time taking Ritalin,[2] Celexa,[3] and Xanax.[4] She complained of forgetfulness, with Ritalin not helping as much, but her mood was assisted by Celexa. She used the Xanax very

---

[2]Ritalin is a stimulant used to treat ADHD. http://www.drugs.com/ritalin.html.

[3]Celexa (Citalopram) is an antidepressant. http://www.drugs.com/celexa.html.

[4]Xanax (Alprazolam) is used to treat anxiety disorders, panic disorders, and anxiety caused by depression. http://www.drugs.com/xanax.html.

little.  Dr. Pierce provided a trial of Provigil for "shift work."[5]  (Tr. at 621.)

On February 7, 2008, plaintiff saw Dr. Sandra Billingsley, her primary doctor, for several complaints, including fatigue, achiness, mood swings, lower abdominal cramps, and insomnia. She also had chronic numbness in her right thigh.  She had recently lost her job, which caused more stress.  She also complained of headaches related to a chronically stiff neck.  She reported seeing Dr. Pierce for depression, receiving Citalopram and Alprazolam, which she said she had not been taking very often.  Dr. Billingsley had her on Nortriptyline[6] at bedtime for possible fibromyalgia.  She was on Ritalin from Dr. Pierce as well and despite that felt fatigued. Her weight was 196 pounds, for a "BMI" of 34.[7]  (Tr. at 498.)  On exam, her neck was supple with fair range of motion, and her extremities showed good strength and tone.  Dr. Billingsley checked fibromyalgia trigger points, noting that plaintiff had only about four.[8]  She also had full range of motion with the knees and hips, intact to light touch, but with numbness-type feeling in the right thigh.  Dr. Billingsley believed plaintiff's headaches were neck-related and sent her

---

[5]Provigil (Modafinil) is a medication that promotes wakefulness used to treat excessive sleepiness caused by shift work sleep disorder. http://www.drugs.com/provigil.html.  Shift work sleep disorder is trouble sleeping because a person works nights or rotating shifts. http://www.webmd.com/sleep-disorders/guide/shift-work-sleep-disorder-topic-overview.

[6]Nortriptyline is a tricyclic antidepressant.  http://www.drugs.com/nortriptyline.html.

[7]Body mass index ("BMI") is a measure of body fat based on height and weight that applies to adult men and women.  A BMI of 30 of greater denotes obesity. http://www.nhlbi.nih.gov/health/educational/lose_wt/BMI/bmicalc.htm.

[8]Fibromyalgia is a rheumatological condition characterized by pain, fatigue, disturbed sleep, stiffness, "and – the only symptom that discriminates between it and other diseases of a rheumatic character – multiple tender spots, more precisely 18 fixed locations on the body (and the rule of thumb is that the patient must have at least 11 of them to be diagnosed as having fibromyalgia) that when pressed firmly cause the patient to flinch."  Sarchet v. Chater, 78 F.3d 305, 306 (7th Cir. 1996).

4

to physical therapy. She also ordered lab work. (Tr. at 499.)

On February 21, 2008, plaintiff went to the All Saints Medical Center for mental health services. (Tr. at 564-65.) She reported living with her ex-husband and kids in low income housing. She listed hobbies of spending time with family, kayaking, fishing, camping, and biking, but indicated that her leisure interests had changed and weight gain interfered at times. (Tr. at 569.) Her treatment goals were to improve communication with her partner, develop goals as a couple, and deal with his alcohol issues. (Tr. at 575.) The therapist, Nancy Habrel, MSW, listed a current GAF of 60,[9] indicating that plaintiff came to therapy to address depression, anxiety, and family problems. (Tr. at 576.) Plaintiff also saw Dr. Pierce, reporting that she lost her job, the only source of income. She reported being very moody, with low motivation. He provided a trial of Lamictal[10] and discontinued Celexa. (Tr. at 620, 789.) Plaintiff canceled her next session with Habrel on February 28. (Tr. at 577.)

On April 11, 2008, plaintiff returned to Dr. Billingsley for follow up of early diabetes and complaining of overall achiness and fatigue. The labs completed in February were normal. Her weight was up a couple pounds to 198, a BMI of 34. (Tr. at 494.) Dr. Billingsley assessed

---

[9]GAF ("Global Assessment of Functioning") rates the severity of a person's symptoms and her overall level of functioning. Set up on a 0-100 scale, scores of 91-100 are indicative of a person with no symptoms, while a score of 1-10 reflects a person who presents a persistent danger of hurting herself or others. Scores of 61-70 reflect mild symptoms, 51-60 moderate symptoms, and 41-50 severe symptoms. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32-34 (4th ed. 2000). The fifth edition of the DSM, published in 2013, abandoned the GAF scale because of "its conceptual lack of clarity . . . and questionable psychometrics in routine practice." Williams v. Colvin, 757 F.3d 610, 613 (7th Cir. 2014).

[10]Lamictal (Lamotrigine) is an anti-epileptic medication used to treat epileptic seizures and to delay mood episodes in adults with bipolar disorder (manic depression). http://www.drugs.com/lamictal.html.

bronchitis and upper respiratory infection, treating with Zithromax and Mucinex; borderline diabetes; and non-specific abdominal pain, probably related to chronic bloating. Dr. Billingsley suggested improved diet and exercise. (Tr. at 495.)

On May 8, 2008, plaintiff returned to All Saints for family counseling with her husband, with a GAF of 55. Her husband reported a relapse with alcohol, and plaintiff recognized her own deteriorated self-care. Therapist Habrel recommended a medical consult regarding current medications and individual sessions in addition to couple's counseling. (Tr. at 578.)

On May 13, 2008, plaintiff saw Nancy Maczka, NP, for ongoing treatment after Dr. Pierce, whom she had been seeing since May 2004, left the area. Plaintiff initially saw Dr. Pierce for evaluation of attention deficit disorder after a referral by the special needs department at her nursing school. She had been taking Ritalin, finding it very helpful with her ability to concentrate and finish tasks. She was also receiving Provigil daily for shift work. She was currently working at a bar on weekends and looking for more permanent employment. She was also using Xanax, which helped her relax. At her most recent appointment with Dr. Pierce in February 2008, she reported increased dysphoric mood, anxiety, and frustration. At that time, she had lost her job, her only source of income. She was also reporting decreased energy and motivation, and Dr. Pierce discontinued Celexa and started Lamictal. She reported continued decreased motivation, increased sleep, body aches, and frequent mood swings. She stated this was partially due to difficulties with her former husband. (Tr. at 617, 786.) She reported being divorced but lived with her ex-husband and two children, ages 15 and 11. On mental status exam, she was alert and oriented to person, place, and time, with good attention, and fair recall. She had fair to good insight and judgment. Her affect was restricted to euthymic, and her mood described as dysphoric. Her thought process was logical and goal

6

directed.  (Tr. at 618, 787.)  NP Maczka diagnosed attention deficit disorder, inattentive type; adjustment disorder with anxiety and depressed mood; and a GAF of 60.  She continued Ritalin, Xanax, and Provigil, and increased Lamictal.  (Tr. at 619, 788.)

On May 15, 2008, plaintiff returned to All Saints, feeling withdrawn with reduced motivation.  (Tr. at 579.)  On May 19, she reported deterioration in mood secondary to her partner being admitted to the hospital.  She also reported anger and frustration.  (Tr. at 580.) On May 29, plaintiff returned with her husband.  He reported that she was unable to get out of bed due to depression.  (Tr. at 581.)  On June 9, plaintiff and her husband reported that plaintiff was having trouble with self-care.  They discussed short-term strategies.  (Tr. at 582.)

On June 17, 2008, plaintiff saw NP Maczka, related to her diagnoses of ADHD, inattentive type, and adjustment disorder with anxiety and depressed mood.  She was on Ritalin, Xanax, Provigil, and Lamictal.  Her financial stressors continued, and she continued to work on her job search.  She reported medication compliance with no side effects.  Xanax had helped reduce her frustration and irritability.  NP Maczka noted mild improvement despite financial/family stressors, continuing medications.  (Tr. at 614, 785.)[11]

On July 14, 2008, plaintiff and her husband returned to All Saints, reporting improved interactions and less arguing.  Plaintiff canceled her July 28 appointment.  (Tr. at 583.)

On July 15, 2008, plaintiff saw NP Maczka, reporting that she was feeling better, looking for a job.  She reported medication compliance, and on mental status exam she appeared pleasant and calm, with euthymic affect.  NP Maczka noted continued improvement in mood and continued medications.  (Tr. at 613, 784.)

---

[11]On June 18, 2008, plaintiff received diabetes education, including appropriate diet and regular blood sugar testing.  (Tr. at 674-75.)

On July 17, 2008, plaintiff went to the emergency room ("ER") for dysmenorrhea and pelvic pain. (Tr. at 678.) Dr. James Holmberg provided a Toradol injection (Tr. at 679), obtained tests, and provided a prescription for Percocet (Tr. at 680).[12]

On August 13, 2008, plaintiff went to urgent care complaining of low abdominal pain and cramping, similar to the symptoms for which she had been seen in the ER the previous month. She had been taking Advil without relief of the pain. She reported receiving Vicodin in the ER, which made her itch. (Tr. at 491.) She was given an injection of Toradol and provided Cataflam[13] and Percocet for pain. (Tr. at 492.)

On August 15, 2008, plaintiff saw Dr. Billingsley regarding her pelvic pain and dysmenorrhea. She had an appointment with Dr. George Maker in gynecology set for September 4, 2008. (Tr. at 487.) Dr. Billingsley gave her Percocet and Cataflam, ordered an ultrasound, and had her see Dr. Maker as scheduled. (Tr. at 488, 682.)

On September 4, 2008, plaintiff saw Dr. Maker for consultation regarding pelvic pain and dysmenorrhea. She had been going to urgent care, receiving Percocet and Cataflam, which worked minimally. (Tr. at 482.) After discussing the matter with Dr. Maker, plaintiff elected to have a hysterectomy. (Tr. at 483-84.)

On September 8, 2008, therapist Habrel sent plaintiff a letter to see if she was still interested in services. Habrel wrote that if she did not hear from plaintiff by October 9, she would close the case. (Tr. at 592.)

---

[12]An August 5, 2008 note from NP Maczka indicated that plaintiff was "not eligible for insurance." (Tr. at 612.)

[13]Cataflam (diclofenac potassium) is a nonsteroidal anti-inflammatory drug (NSAID) used to treat mild to moderate pain, rheumatoid arthritis and osteoarthritis, and cramping pain in the lower abdomen associated with menstruation. http://www.drugs.com/cataflam.htm.

On September 9, 2008, plaintiff saw NP Maczka, complaining of financial stress and low motivation. She reported medication compliance. Her mood was okay, her affect euthymic, and her judgment and insight fair. NP Maczka encouraged part-time work and weekly individual therapy. Plaintiff had Nortriptyline for sleep but had not used it. NP Maczka considered Effexor.[14] (Tr. at 611, 783.)

On September 16, 2008, plaintiff saw Dr. Billingsley for follow up of her pelvic pain. She had seen Dr. Maker, who planned a hysterectomy. Dr. Billingsley provided a Toradol shot for pain and refilled Percocet. (Tr. at 479.) The surgery was scheduled for October 21, and plaintiff was to see Dr. Billingsley for a pre-op physical the week prior. (Tr. at 480.)

On October 7, 2008, plaintiff went to urgent care with a chest cold. (Tr. at 475.) Dr. Linda Lee assessed an upper respiratory tract infection. (Tr. at 476.) Plaintiff also saw NP Maczka that day, indicating she had not taken her medications for several days. She inconsistently took Lamictal, but was taking Ritalin and Xanax as prescribed, which helped with her focus, motivation, and irritability. NP Maczka emphasized the importance of taking Lamictal regularly. (Tr. at 610, 782.)

On October 13, 2008, plaintiff went to urgent care complaining of abdominal pain. She was scheduled for a hysterectomy on October 21. (Tr. at 470.) She was given Toradol for pain relief and discharged with Percocet. (Tr. at 471.)

On October 16, 2008, plaintiff saw Dr. Billingsley for pre-op clearance for the hysterectomy scheduled for October 21. (Tr. at 465.) Dr. Billingsley noted that plaintiff took a variety of medications, including Lamictal, Ritalin, and Nortriptyline, but did so inconsistently.

---

[14]Effexor (Venlafaxine) is an antidepressant. http://www.drugs.com/effexor.html.

Plaintiff reported being a homemaker at the time. She had a persistent cough, and they discussed postponing the surgery until it cleared. (Tr. at 466.) Dr. Billingsley decided to put plaintiff on Zithromax and see her back in a few days. (Tr. at 467.) Plaintiff returned on October 20, with her bronchitis improved. She was cleared for the next day's hysterectomy. (Tr. at 462.)

On October 21, 2008, Dr. Maker performed the hysterectomy. (Tr. at 684-85.) On October 23, plaintiff returned to Dr. Maker with a fever and pain, and possible urinary tract obstruction or infection related to surgery. He admitted her for intravenous antibiotics and testing, including a CT scan. (Tr. at 461, 692-93, 698.) Dr. Steven Bernstein assessed probable left ureteral obstruction (Tr. at 695), inserting a stent (Tr. at 703). On October 27, plaintiff returned to Dr. Maker for post-operative staple removal. Her uretal obstruction was resolving, and her fever had resolved with antibiotics. (Tr. at 458.)

On October 31, 2008, plaintiff saw Dr. Billingsley for a pre-operative physical prior to her November 7 stent removal. She was taking only Ibuprofen for pain. (Tr. at 454.) Her bronchitis had resolved and her fever improved on anti-biotics. Dr. Billingsley found her stable for the stent removal. (Tr. at 455.)

On November 5, 2008, plaintiff saw Dr. Bennett Pastika for a gastroenterology consult due to issues with bloating. She had stable symptoms of gastritis, off of "PPI" therapy at that point.[15] Dr. Pastika recommended a repeat colonoscopy early next year. (Tr. at 449.)

On December 16, 2008, plaintiff saw Dr. Maker for follow up after the hysterectomy, with

---

[15]Proton pump inhibitors ("PPIs") are medications used to treat and prevent symptoms of gastroesophageal reflux disease ("GERD"). See http://www.webmd.com/heartburn-gerd/proton-pump-inhibitors-for-gastroesophageal-reflux-disease-gerd.

a normal post-op course. (Tr. at 442.) She also saw Dr. Billingsley complaining of headaches. She had been off her pain medications due to the hysterectomy. She had also quit taking her psych medications. She took Nortriptyline at bed time, but not consistently. She reported a recent fainting episode and also reported some neck pain. (Tr. at 445.) On exam, she moved her neck fairly well. Dr. Billingsley told her to take the Nortriptyline regularly at bedtime, as this could help with headache prevention. Dr. Billingsley also started her on Topamax[16] and provided samples of Zomig[17] and Relpax[18] to try when she got a headache. Dr. Billingsley also sent her to physical therapy ("PT") for her neck and provided a Toradol shot for headache. (Tr. at 446.)

On December 29, 2008, plaintiff was seen for physical therapy regarding her neck pain and headaches. (Tr. at 734.) Her symptoms were consistent with tension headache. She presented with decreased cervical mobility and moderate tightness of the cervical muscles, likely contributing to her headache symptoms. The therapist concluded that she would benefit from an exercise program to improve mobility, as well as tension relieving exercises, ultrasound, and soft tissue massage. (Tr. at 735.) She was to be seen twice weekly for the next four weeks. (Tr. at 736, 737-39.)

On December 30, 2008, plaintiff returned to NP Maczka, reporting that she had restarted medications but did not take them consistently. She reported no ambition, poor sleep, and frequent headaches. NP Maczka indicated plaintiff was to continue Lamictal and Xanax,

---

[16]Topamax (Topiramate) is a seizure medicine also used to prevent migraine headaches. http://www.drugs.com/topamax.html.

[17]Zomig (Zolmitriptan) is a headache medicine. http://www.drugs.com/zomig.html.

[18]Relpax (Eletriptan) is also a headache medicine. http://www.drugs.com/relpax.html.

11

restarted Ritalin, and begin Wellbutrin.[19]  Plaintiff agreed to take medications consistently.  (Tr. at 608, 781.)

On January 13, 2009, plaintiff saw Dr. Billingsley for follow up of her headaches.  She had been going to physical therapy, which helped somewhat.  She started on Topamax and took Nortriptyline and was put on Estradiol for post-menopausal symptoms after her hysterectomy.  The migraine medications previously provided did not help her.  Her neck had better range of motion, but she still had some neck pain and still had headaches.  She also reported a cold and earache.  (Tr. at 438.)  Dr. Billingsley suggested Mucinex and gave her Z-Pak.  She was to continue with a home exercise program.  (Tr. at 439.)

On January 15, 2009, plaintiff returned to All Saints for individual counseling, with diagnoses of adjustment disorder and ADHD and a GAF of 60.  She indicated that she was trying to exercise and focus on her diet.  (Tr. at 584.)  On January 22, she reported taking all medications as prescribed for the past week to 10 days, noticing improvement in motivation and energy.  She did notice a rash on her forearm, wondering if it was a medication side effect.  Therapist Habrel told her to contact NP Maczka if it worsened.  (Tr. at 585.)

On January 27, 2009, plaintiff saw NP Maczka, complaining of headaches and sleep disturbance.  She had been taking medications as prescribed for two to three weeks except for Nortriptyline.  She was seeing Nancy Habrel weekly,[20] in physical therapy, watching her diet,

---

[19]Wellbutrin (Bupropion) is an antidepressant medication used to treat major depressive disorder and seasonal affective disorder.  http://www.drugs.com/wellbutrin.html.

[20]Plaintiff canceled her January 29, 2009 appointment with Habrel due to car trouble (Tr. at 586), and the February 5 note indicated that she was "not eligible for services today thru her insurance" (Tr. at 587).  She returned on March 12 but left early because she was feeling ill. (Tr. at 588.)  She canceled on March 23.  (Tr. at 589.)  Plaintiff failed to keep her March 26 appointment (Tr. at 590), and on April 1, 2009, she was discharged from services at All Saints

and reducing her smoking.  Her mood was improved and her affect bright.  NP Maczka reduced the Lamictal dose and adjusted the timing of Ritalin.  Plaintiff was to take Nortriptyline as prescribed by Dr. Billingsley.  (Tr. at 607, 780.)

On February 24, 2009, plaintiff returned to NP Maczka, indicating she had not been able to go to PT or counseling due to insurance issues.  She reported having a couple job applications out.  Her mood was good, and she reported medication compliance.  On mental status exam, her thoughts were more focused and calm.  NP Maczka continued medications and told her to resume counseling.  (Tr. at 606, 779.)

On March 9, 2009, plaintiff discharged from physical therapy for her neck pain and headaches.  (Tr. at 740.)  At her last visit on February 16, plaintiff noted she had been unable to be consistent with therapy due to scheduling conflicts.  (Tr. at 739, 740.)  It was mutually decided to place therapy on hold due to insurance changes.  Plaintiff reported her insurance would be able to cover therapy again in March 2009, but she failed to show for her two scheduled appointments in March and was discharged.  She had reported 40-50% improvement in her symptoms.  (Tr. at 740.)  She reported that on average her headaches occurred three times per week but were not as intense as they had been, and she was still able to function.  (Tr. at 740-41.)

On March 24, 2009, plaintiff returned to NP Maczka, reporting that her husband was in jail for an altercation.  She had been doing well mood-wise prior to this incident but now felt exhausted and overwhelmed.  She reported medication compliance with no side effects.  She could not find a job.  NP Maczka continued medications.  (Tr. at 605, 778.)

_____

due to non-compliance with attendance for out-patient services with Habrel (Tr. at 591).

13

On April 13, 2009, plaintiff saw Tim Caulfield, Ph.D., a clinical psychologist, reporting severe agitation, distractibility, mood swings, anxiety, confusion, depression, memory problems, insomnia, lack of concentration, headaches, and excessive fatigue for more than a year. (Tr. at 517.) During their intake session, plaintiff discussed issues with her family. She indicated she was out of work and still waiting for a chance to try to take her LPN test. She indicated that she just did not feel well, with low motivation, poor focus, and forgetfulness. She was taking Wellbutrin, Nortriptyline, Xanax, and Ritalin. (Tr. at 520.)

On April 14, 2009, plaintiff saw Dr. Billingsley for multiple problems, her biggest being fatigue. She missed some appointments with All Saints and lost her counselor there but had gotten back in with Dr. Caulfield. She was on Ritalin, Lamictal, and Wellbutrin. She felt her hormones were off; she had been on Estradiol tablets, but they switched her to the Climara patch. She was on Nortriptyline for insomnia and used Topamax for headaches. She did not have a job, did not pass her LPN boards, and was frustrated about her weight gain. Her weight was unchanged at 202, a BMI of 35. Her gait was normal, and she had no joint complaints, just somewhat achy all over. Dr. Billingsley ordered a sleep study and lab work. She also encouraged exercise, good diet, and work on weight loss. (Tr. at 435-36.)

On April 20, 2009, plaintiff returned to NP Maczka, indicting that she was seeing Dr. Caulfield. She was off her medications for four days and did not call for refills. Her weight was up and her motivation down. Her mood was okay, and her affect euthymic. NP Maczka continued medications and encouraged limited portions and exercise. (Tr. at 604, 777.)

On May 6, 2009, plaintiff saw Dr. Caulfield, stressed due to her husband's legal issues. She reported feeling bleak the last few days, with flu-like problems. (Tr. at 524.) She returned to Dr. Caulfield on May 13, discussing her husband's legal issues. She still felt poorly,

14

wondering if it was because of her medications – Lamictal, Ritalin, Alprazolam, Nortriptyline, Topamax, and Wellbutrin. (Tr. at 523.)

On May 26, 2009, plaintiff saw NP Maczka, complaining of muscle spasms and headaches. She reported stress due to lack of employment and her husband's legal charges. She reported depression and was occasionally tearful. NP Maczka recommended using Nortriptyline for sleep and headaches, and increased the Lamictal dose. (Tr. at 603, 776.) On June 23, plaintiff reported medication compliance. She indicated that she recently started part-time bartending. Her mood was okay, "laughing." NP Maczka continued medications and encouraged exercise. (Tr. at 602, 775.)

On June 24, 2009, plaintiff returned to Dr. Caulfield, indicating that dealing with the heat had been a struggle. She stated that she could start bartending but had to get an operator licence. She was looking for work. (Tr. at 521.) On July 1, plaintiff reported financial stress. She and Dr. Caulfield discussed her diagnosis of bipolar and how her mood cycles and concentration problems had interfered with her schooling and work in the past. (Tr. at 522.)

On July 3, 2009, plaintiff saw Dr. Billingsley for follow up of her headaches. Plaintiff said the headaches were better, but she hurt all over and felt she had no energy. She related pain in her left hand and wrist for about five days. She further reported weight gain and indicated she had not been eating well or exercising, just lying around all day. She related that she wanted her old self back. Her weight was up seven pounds to 209, a BMI of 36. On exam, her left hand showed fairly good range of motion, but she could not squeeze it real tight. She was tender through the carpal tunnel area, but she had no particular joint redness, heat, or swelling. Her labs were basically normal. (Tr. at 431.) She had not gone for the sleep study but wanted to reschedule it. Dr. Billingsley again stressed the importance of diet and exercise. She also

15

told plaintiff to review her medications with her nurse practitioner, particularly the Lamictal, which could cause fatigue. She was also on high doses of Ritalin and used Topamax intermittently for headaches, which had been better. Dr. Billingsley suggested soaking the left hand in warm water. (Tr. at 432.)

On July 21, 2009, plaintiff returned to NP Maczka, reporting medication compliance. She complained of fatigue, indicating she was up late, renovating the house. She also reported babysitting and working two days bartending. She further reported being more active. She was using Nortriptyline at night for headaches. She wanted to go back to school. On mental status exam, her mood was okay. NP Maczka continued medications. (Tr. at 601, 774.)

On July 22, 2009, plaintiff told Dr. Caulfield that her brother and sister-in-law were living at her apartment, hopefully short-term. Her affect and mood were better than last time. (Tr. at 528.) On August 19, plaintiff advised Dr. Caulfield that she had banned alcohol from the home due to her brother and his girlfriend fighting. She was still struggling to find more employment for all of them. (Tr. at 526.) On September 2, plaintiff told Dr. Caulfield that her husband worried about money but still had no work. Plaintiff was "still working a couple of days bartending." (Tr. at 527.) She also reported that her niece recently committed suicide. (Tr. at 527.)

On September 4, 2009, plaintiff saw Dr. Billingsley for follow up of her headaches. She was trying to take the Topamax. She reported having a part-time job cooking in a restaurant. She had lost about nine pounds, but the headaches were worse. She asked for a Toradol shot to help with the headaches. (Tr. at 428.) Dr. Billingsley provided a physical therapy referral for the headaches, as it had helped before. Plaintiff also complained of right lower extremity numbness and tingling, so Dr. Billingsley ordered an EMG. (Tr. at 429.)

16

On September 9, 2009, plaintiff saw Dr. Caulfield, indicating that her brother and his girlfriend came home from drinking and ended up in a physical altercation to which police were called. She had not heard from the police yet. (Tr. at 529.)

On September 15, 2009, plaintiff reported medication compliance to NP Maczka. She discussed family issues, including problems with her brother and husband, and her niece's suicide. She had a job interview that day for a bartender position. She planned on walking her daughter to school to lose weight and control her blood sugars. On mental status exam, she was goal directed. NP Maczka continued medications. (Tr. at 600, 773.)

On September 16, 2009, plaintiff reported to Dr. Caulfield that her brother started a job. She had been working more hours for awhile but now wanted to take care of herself. They continued to work on issues regarding her niece's death. (Tr. at 530.)

On September 18, 2009, plaintiff underwent the EMG requested by Dr. Billingsley to rule out radiculopathy and possible neuropathy. (Tr. at 711.) The test revealed no evidence of neuropathy involving the large fibers of the right lower extremity. However, the findings were incomplete as plaintiff could not tolerate the procedure because of pain. The limited exam as done was normal. (Tr. at 712.)

On September 23, 2009, plaintiff started a new round of PT for her neck and back pain. (Tr. at 743.) She had neck pain with decreased motion and increased muscle guarding. (Tr. at 746.) On September 24, Dr. Billingsley referred plaintiff to Advanced Pain Management and provided a prescription for Vicodin for low back pain. (Tr. at 426.)

On October 7, 2009, plaintiff reported to Dr. Caulfield that her fibromyalgia was acting up and her headaches were worse. She had been receiving PT for the headaches. She had a job interview at a group home and was feeling pretty good about it. (Tr. at 531.)

17

On October 13, 2009, plaintiff called Dr. Billingsley complaining of back pain, and Dr. Billingsley provided a prescription for Vicodin. (Tr. at 425.) On October 15, plaintiff saw Terry Flanigan, NP, at Advanced Pain Management with a chief complaint of low back pain, radiating into the bilateral lower extremities. She reported that the pain was aggravated by sitting, bending, lifting, standing, walking, and lying down, relieved by ice, heat, lying down, rest, and medication. She also complained of neck pain with headaches. She reported occasional urinary incontinence if driving and unable to get to a bathroom. She never had PT for her low back and denied previous use of TENS unit. She was taking Vicodin recently prescribed by her primary care physician. She also reported taking Tylenol and Ibuprofen. She reported that she was not working. (Tr. at 386.) On neurologic exam, the upper extremities were normal to pinprick and light touch, but the lower extremity exam revealed hyperesthia in the right lateral thigh. Motor strength was normal in the upper extremities and the lower extremities aside from the left sided hallucis longus (L4-5, S1).[21] Deep tendon reflexes of the Patellar were 1+ bilaterally and of the Achilles were 2+ bilaterally. (Tr. at 387.) NP Flanigan diagnosed cervicalgia, low back pain, lumbar radiculopathy, and headache, providing a referral for PT. If she obtained no relief from PT, they would obtain a lumbar MRI. He also arranged for a TENS unit and prescribed Gabapentin.[22] (Tr. at 388.)

On October 27, 2009, plaintiff returned to Dr. Caulfield. She indicated that they may not even do Christmas at this point in order to reduce the conflict level within the family. She also

---

[21]The extensor hallucis longus muscle extends the foot's big toe. http://www.healthline.com/human-body-maps/extensor-hallucis-longus-muscle.

[22]Gabapenin (Neurontin) is used to treat nerve pain. http://www.drugs.com/gabapentin.html.

reported stress due to financial constraints. (Tr. at 532.) On November 4, she indicated that nothing was going right, and she didn't feel right. She also discussed employment issues. (Tr. at 533.)

An October 28, 2009, physical therapy note indicated that, functionally, plaintiff was limited in all activities due to severe neck and back pain. (Tr. at 752.) She now had orders for low back as well as neck pain. She was issued a TENS unit. (Tr. at 753.)

On November 10, 2009, plaintiff saw NP Maczka, reporting medication compliance. She indicated that work was slow, and she was considering truck driving. She was seeing Dr. Caulfield weekly and had no new medical concerns. She did complain of fatigue and was seeking help at the pain management clinic. On mental status exam, she had euthymic affect and denied homicidal or suicidal ideation. NP Maczka continued medications and encouraged couple's therapy. (Tr. at 599, 772.)

On November 30, 2009, plaintiff discharged from physical therapy, noting reduced neck and back pain. From a functional standpoint, she was able to stand and wash dishes but was still limited in ambulating in the grocery store. She also reported intermittent headaches, with the last headache being severe but more likely being sinus-related. She demonstrated improved mobility with less guarding. (Tr. at 743.) Her function had improved, but she still had pain. (Tr. at 744.)

On December 2, 2009, plaintiff went to urgent care, complaining of neck swelling. (Tr. at 420.) She had just finished a round of physical therapy and did have some warm ultrasound treatments to the back of her neck. Dr. Richard Wagner diagnosed thyromegaly,[23] suggesting

---

[23]Thyromegaly is enlargement of the thyroid gland. Stedman's Medical Dictionary 1834 (27th ed. 2000).

aspirin for discomfort and ordering an ultrasound. (Tr. at 421.) The December 8 ultrasound of the thyroid gland revealed a multi-nodular goiter. (Tr. at 714.)

On December 11, 2009, plaintiff saw Dr. Billingsley for follow-up. She had quit taking Topamax and using her Climara patch, but did not complain of hot flashes. Her headaches were about the same. She continued on Lamictal, Wellbutrin, Ritalin, and Xanax. She had quit taking Nortriptyline, and Dr. Billingsley reminded her that could help with her fibromyalgia and headaches. (Tr. at 413.) Plaintiff asked about Lyrica,[24] and Dr. Billingsley told her to talk to her pain specialist. (Tr. at 413-14.) Dr. Billingsley provided an endocrinology referral. (Tr. at 414.)

On December 23, 2009, plaintiff returned to Dr. Caulfield, "tearfully miserable." (Tr. at 534.) She reported that she could not pay bills and do what she usually did. They discussed coping strategies. (Tr. at 534.)

On January 5, 2010, plaintiff saw NP Maczka for medication management. Her current medications were Buproprion, Ritalin, Alprazolam, and Lamotrigine. She continued to work two nights per week as a bartender. On mental status exam, her mood was good, affect euthymic, and outlook positive. NP Maczka assessed attention-deficit disorder, primarily inattentive type, and depression, not otherwise specified, stable. Her presentation was significantly improved and they continued current treatment. (Tr. at 597, 770.)

On January 13, 2010, plaintiff reported to Dr. Caulfield that her brother went back to jail after a big fight with his girlfriend. They discussed continued chaos in the family. (Tr. at 537.) On January 27, plaintiff reported good news from her endocrinologist regarding her thyroid but may need at least partial surgical resection of it. (Tr. at 536.) On February 3, plaintiff indicated

---

[24]Lyrica is used to control seizures, treat fibromyalgia, and treat pain caused by nerve damage in people with diabetes (diabetic neuropathy). http://www.drugs.com/lyrica.html.

that she had court the following week due to conflict with her brother's girlfriend, feeling anxious and stressed about this. She was still trying to find additional work to help make ends meet. (Tr. at 535.)

On February 11, 2010, plaintiff saw Dr. John Bowman, on referral from Dr. Billingsley for evaluation of the thyroid nodule. Plaintiff was working part-time as a bartender and was told by one of her patrons that her neck looked larger. She saw her primary doctor, and an ultrasound of the thyroid revealed a large goiter with a large nodule occupying most of one side. Plaintiff was referred to Dr. Amer Kassar (Tr. at 660), and a needle biopsy suggested a benign cystic component (Tr. at 344, 656). Plaintiff reported mild diabetes, osteoarthritis with knee discomfort and back discomfort, and depression. (Tr. at 345.) Dr. Bowman concluded that although negative for malignancy on needle biopsy, the lesion should be removed due to pressure symptoms and the limited accuracy of the biopsy with a lesion of this size. (Tr. at 346.)

On February 17, 2010, plaintiff returned to Dr. Caulfield, indicating she would be going in the next week for a right thyroidectomy and just was not feeling well. She wondered if her thyroid issue may relate to her diabetes and leg pain. (Tr. at 538.)

On February 19, 2010, plaintiff saw Dr. Billingsley for follow up of her thyroid problems, elevated blood sugar, and irritable bowel. She also complained of aches all over. She was taking Xanax and Nortriptyline. Dr. Billingsley encouraged her to eat better to control her diabetes. (Tr. at 408.) She was able to walk without an assistive device and had no acute joint complaints. Dr. Billingsley assessed thyroid nodules, with surgery planned the following week; irritable bowel, unchanged; fibromyalgia, unchanged; anxiety, depression, unchanged; and diabetes, okay without medications, but if she continued poor compliance with diet at some

21

point medications would need to be added.  (Tr. at 409.)[25]

On February 25, 2010, plaintiff was admitted to the hospital for surgery, with Dr. Bowman performing a right thyroid lobectomy, discovering a 4.3 cm papillary carcinoma.  The following day, she was returned to surgery for a thyroidectomy and central neck dissection.  She discharged from the hospital on February 28, 2010.  (Tr. at 318.)

On March 10, 2010, plaintiff returned to Dr. Caulfield, indicating she found out she had thyroid cancer.  They discussed family relationships and neglectful behavior by her husband and kids.  (Tr. at 539.)  On March 17, plaintiff reported feeling down because the husband of her best friend died suddenly of a heart attack.  (Tr. at 540.)

On March 18, 2010, plaintiff saw NP Flanigan and Dr. Kostandinos Tsoulfas at Advanced Pain Management regarding her low back pain.  She reported that the pain was aggravated by everything and got better with heat.  She had numbness in her right thigh and weakness in her bilateral hands.  The pain interfered with daily activities and sleep, and made her feel depressed and frustrated.  She indicated she was not working.  She had lost 12 pounds but reported suffering from insomnia and fatigue.  (Tr. at 383.)  She was negative for mid-back pain, but positive for joint pain, neck pain, low back pain, and weakness.  Neurological review was positive for headache, memory loss, and numbness.  They assessed chronic low back pain with L3, L5 right thigh radicular symptoms, as well as neck pain with related headaches.  The low back pain and radicular symptoms were her main concern.  She had last been seen at the pain clinic as a new patient on October 15, 2009, and had not followed up with the treatment plan since then.  She was vague regarding whether she had PT

---

[25]A February 23, 2010 chest x-ray revealed no acute cardiopulmonary disease.  (Tr. at 716.)

for her back. She reported stopping Gabapentin after several weeks due to ineffectiveness but was unable to state what dose she was on. They diagnosed cervicalgia, low back pain, lumbar radiculopathy, and headache, making another referral for PT for her low back. If she experienced no relief from therapy, they would order an MRI. She was to continue using her TENS unit, discontinue Gabapentin, and return in one month. (Tr. at 384.)

On March 30, 2010, plaintiff saw Dr. Al-Jaghbeer, an endocrinologist, for further management of her thyroid cancer and type 2 diabetes. Following her thyroid surgery, she was discharged on Cytomel[26] twice daily but frequently skipped the evening dose. She denied any numbness or tingling in the face or hands, but she did complain of severe fatigue, weakness, muscle aches, excessive thirst, and excessive urination. Plaintiff was told she had diabetes and better control it with diet as it was a mild case. She also complained of worsening migraine headaches. (Tr. at 663.) Dr. Al-Jaghbeer stopped Cytomel and started Levothyroxine,[27] started Onglyza,[28] and for migraines provided a prescription for Vicodin. She was also encouraged to use her Topamax. (Tr. at 665.)

On April 6, 2010, plaintiff presented at the urgent care clinic complaining of chest pain. (Tr. at 403.) An EKG done at the time of arrival showed no acute changes, elevations. Plaintiff and her mother left against medical advice before lab results were obtained. Stephanie Jorgenson, PA-C, called plaintiff with the results, which were largely negative. She encouraged

---

[26]Cytomel is used to treat low thyroid function. http://www.drugs.com/cdi/cytomel.html.

[27]Levothyroxine treats hypothyroidism (low thyroid hormone). http://www.drugs.com/levothyroxine.html.

[28]Onglyza (Saxagliptin) is an oral diabetes medicine that helps control blood sugar levels. http://www.drugs.com/onglyza.html.

plaintiff to follow up with her primary doctor, assessing chest pain not acute cardiac. (Tr. at 404.)

On April 8, 2010, plaintiff called Dr. Billingsley, indicating she got sick from expired Topamax. She was taking Ibuprofen daily but not taking Nortriptyline. Dr. Billingsley did not refill Topamax, told her to limit Ibuprofen to two to three times per week, resume Nortriptyline, and push water, exercise. (Tr. at 402.)

On April 13, 2010, plaintiff saw NP Maczka, reporting that she stopped taking her anti-depressant medication one week ago because her children said she was crabby and short-tempered. She admitted not taking her medication regularly prior to that. NP Maczka discontinued the anti-depressants per plaintiff's request. Plaintiff was instructed to bring all of her medications with her to the next appointment. (Tr. at 596, 769.)

On April 28, 2010, plaintiff reported to Dr. Caulfield that NP Maczka had stopped all of her psych medications – Xanax, Wellbutrin, Ritalin, and Lamictal. Her endocrinologist had started her on medication for her diabetes. She reported feeling more forgetful and tired/unmotivated. (Tr. at 541.)

On April 29, 2010, plaintiff returned to Dr. Al-Jaghbeer. (Tr. at 666.) For the thyroid cancer, he referred her to nuclear medicine for radioactive iodine therapy and for her uncontrolled diabetes referred back to diabetes education and switched her from Onglyza to Byetta.[29] (Tr. at 667.)

On May 4, 2010, plaintiff saw NP Maczka, off her psychiatric medications. Her husband was out of the house. She was using Nortriptyline for sleep but had not taken it for several

_____

[29]Byetta (Exenatide) is an injectable diabetes medicine that helps control blood sugar levels. http://www.drugs.com/byetta.htm.

days. On mental status exam, she was angry, depressed, and tearful at times. NP Maczka encouraged plaintiff to see her counselor consistently and started Effexor. (Tr. at 595, 768.) On May 5, plaintiff reported to Dr. Caulfield that her husband was out of the house after he cheated. (Tr. at 542.)

On May 7, 2010, plaintiff saw Dr. Billingsley for follow up after her neck surgery. She was scheduled for some radioactive iodine treatment. She had quit taking Lamictal but continued with Ritalin. She had been given samples of Effexor. She was feeling agitated and in a lot of pain. She had been to the pain clinic but was not getting relief. She was taking over-the-counter Ibuprofen and Tylenol for pain. She did not like the feeling Hydrocodone gave her. She was taking Nortriptyline at night for sleep. (Tr. at 397.) Her main complaint that day was pain all over with myalgias, abdominal pain, very non-specific. (Tr. at 397-98.) She was also agitated over issues with her husband. She asked for a Toradol shot to help with pain and headaches, which Dr. Billingsley provided. Her psychologist and nurse practitioner were to follow her for her agitated depression. Her endocrinologist followed her diabetes, hypothyroid, and thyroid cancer. (Tr. at 398.)

On May 13, 2010, plaintiff underwent an iodine-123 body scan, which showed increased activity in the thyroid bed, compatible with residual thyroid tissue, but no evidence of metastatic disease. (Tr. at 546.) On May 14, she commenced iodine-131 thyroid therapy for thyroid cancer. (Tr. at 548, 550.)

On May 19, 2010, plaintiff returned to Dr. Caulfield, her mood better. She indicated that the kids missed their dad, but the household had been happier with him gone. (Tr. at 543.)

On May 25, 2010, plaintiff saw NP Maczka for medication management. She was at that the time taking Effexor, Ibuprofen for pain, and Nortriptyline. On mental status exam, she

was mildly irritable, with euthymic affect, and no suicidal or homicidal ideation. NP Maczka started Concerta[30] and increased Effexor. (Tr. at 594, 767.)

On May 26, 2010, plaintiff underwent a lumbar MRI, which revealed disc space narrowing and dessication at L4-5, and bilateral facet arthropathy at L4-5 and L5-S1.[31] (Tr. at 553, 721, 792.) A June 14, 2010, chest x-ray showed no evidence of acute cardiopulmonary disease. (Tr. at 630.)

On June 22, 2010, plaintiff saw NP Maczka, reporting compliance with her medications, Effexor and Concerta. She indicated the Concerta did not help, she was still forgetful. Her mood was irritable. NP Maczka increased Concerta and restarted Alprazolam. (Tr. at 766.)

On June 27, 2010, plaintiff saw Dr. Tsoulfas for follow up of her low back pain. (Tr. at 806.) On exam, her gait was antalgic, and her pain worse with lumbar extension. She was scheduled for a diagnostic facet joint injection/medical branch block ("MBB"). (Tr. at 807.)

On July 20, 2010, plaintiff saw NP Maczka, compliant with her medications, Effexor, Concerta, and Alprazolam. She reported low energy and fatigue, which she attributed to fibromyalgia. On mental status exam, she was calm, pleasant, laughing. NP Maczka increased Concerta. (Tr. at 765.)

On August 11, 2010, plaintiff saw Dr. Tsoulfas for the lumbar MBB. (Tr. at 804-05.) On August 30, she saw Jill Pocius, NP, and Dr. Tsoulfas, reporting that the pain had improved temporarily for six hours since the last visit. (Tr. at 801.) On exam, she had tenderness over

---

[30]Concerta (Methylphenidate) is a central nervous system stimulant used to treat ADHD. http://www.drugs.com/concerta.html.

[31]Facet arthropathy is a type of arthritis common in the lumbar region. Piper v. Astrue, No. 12-cv-1134, 2013 U.S. Dist. LEXIS 65420, at *22 n.24 (C.D. Ill. May 8, 2013).

the lumbar spine and pain with lumbar extension.  (Tr. at 802.)  The second MBB had been denied because of lack of physical therapy, so they provided an order for PT for plaintiff's low back pain.  Plaintiff asked for pain medication, and they provided Norco.[32]  A random urine screen was done, and plaintiff admitted THC use the previous day.  She was warned that she must stop using THC while being prescribed pain medication, and she agreed, signing a narcotics agreement.  (Tr. at 803.)

On September 16, 2010, plaintiff returned to Dr. Al-Jaghbeer, for re-evaluation of her thyroid cancer and diabetes.  She admitted not taking her medications lately, skipping at least half the time.  She had gained weight and had swelling in the face, hand numbness with pain, swelling in the feet, cold intolerance, and fatigue.  (Tr. at 669.)  Dr. Al-Jaghbeer found her non-compliant with Levothyroxine, with symptoms that could be related to thyroid hormone deficiency.  He explained to her the importance of being on thyroid hormone replacement for her thyroid cancer.  He asked her to continue on Onglyza, explaining the risk of significant progression of diabetes if left untreated.  (Tr. at 670.)

On September 21, 2010, plaintiff saw NP Maczka, off her medications for 10 days.  She was back with her husband and looking for work.  She was about to start physical therapy.  On mental status exam, her legs were restless, her voice loud, euthymic affect, poor insight and judgment.  NP Maczka provided refills of Effexor and Alprazolam, discontinued Concerta after plaintiff indicated it did not help her ADHD, and started Vyvanse.[33]  (Tr. at 764.)

---

[32]Norco contains a combination of acetaminophen and hydrocodone, used to relieve moderate to severe pain.  http://www.drugs.com/norco.html.

[33]Vyvanse (Lisdexamfetamine) is a central nervous system stimulant used to treat ADHD.  http://www.drugs.com/vyvanse.html.

On September 22, 2010, plaintiff was seen for PT on referral from Dr. Tsoulfas for low back pain. (Tr. at 754.) She reported an ongoing history of low back pain, for which she had received therapy in the past with minimal success. (Tr. at 754-55.) When she stood for five to 10 minutes to wash dishes she had to sit down due to discomfort. She also reported increased symptoms after walking a couple blocks. On objective exam, lumbar range of motion was decreased, hip strength reduced, and straight leg raise test positive. She had minimal tenderness to palpation of the lumbar paraspinal muscles. She transferred and ambulated independently but moved slowly. Standing tolerance was five to 10 minutes, increased symptoms after walking two to three blocks and bending, and sitting tolerance five to10 minutes. She slept about four hours at the most due to pain. She was able to complete household activities but did so in spurts and with lots of rest breaks. (Tr. at 755.)

On September 27, 2010, plaintiff returned to Dr. Tsoulfas and NP Pocius and was scheduled for a second lumbar MBB. (Tr. at 798-90.) She was also given a urine screen, testing positive for marijuana. She was warned that she must stop using THC and would be tested at the next visit to ensure compliance. She was provided a prescription for Norco. (Tr. at 790.) On October 11, Dr. Tsoulfas performed the MBB. (Tr. at 796-97.)

On October 19, 2010, plaintiff returned to NP Maczka, compliant with her medications. She complained of headaches and sleep disruption. She felt she was the only one doing anything at home. She had euthymic affect, much more pleasant, improved. (Tr. at 763.)

On October 27, 2010, plaintiff returned to Dr. Tsoulfas. He performed radio-frequency lumbar facet denervation. (Tr. at 794-95.)

On November 17, 2010, Dr. Pastika performed various tests based on plaintiff's complaints of stomach pain and history of polyps. (Tr. at 911.) A colonoscopy showed no

28

evidence of colitis. (Tr. at 725.) Dr. Pastika recommended a high fiber diet for diverticulosis, which was probably causing some of her cramping pain in the abdomen. (Tr. at 914.) Another test revealed evidence of antral gastritis, and Dr. Pastika recommended PPI therapy. (Tr. at 916.)

On December 9, 2010, plaintiff saw NP Pocius, reporting 20% relief since her last visit. (Tr. at 808.) On exam, she had tenderness over the lumbar facets. Lower extremity strength was 5/5 except right hip flexion was 4/5. (Tr. at 809.) Pocius obtained a right hip x-ray and scheduled diagnostic left lumbar MBBs. Plaintiff also complained of neck pain and headaches, but they would deal with the low back pain first. They repeated drug tests given plaintiff's last test for THC; plaintiff stated she had stopped THC use. (Tr. at 810.) A January 2, 2011, right hip x-ray revealed mild degenerative changes. (Tr. at 811, 816.)

On January 6, 2011, plaintiff returned to NP Pocius, her pain unchanged. (Tr. at 817.) Her urine screen showed no THC. They refilled Norco and scheduled left lumbar MBBs (Tr. at 819), which Dr. Tsoulfas administered on January 13 (Tr. at 823). On January 27, plaintiff returned to Dr. Tsoulfas for a left lumbar MBB. If there was a positive diagnostic response, they would schedule radio frequency neurolysis. (Tr. at 814-15.) Dr. Tsoulfas also ordered an MRI. (Tr. at 861.) A March 3, 2011, cervical MRI revealed degenerative spondylosis, most conspicuous at C5-C6, where there was moderate disc space narrowing, moderate posterior disc bulge, and bilateral joint hypertrophy, resulting in mild/moderate narrowing of the spinal canal and moderate to severe narrowing of both neural foramina. (Tr. at 918-19.)

On March 7, 2011, Dr. Tsoulfas administered left lumbar radio frequency neurolysis. (Tr. at 857.) On March 21, plaintiff returned to NP Polcius and Dr. Tsoulfas. (Tr. at 854.) On exam, she had tenderness over the lumbar spine. Bilateral lower extremity strength was 5/5

29

aside except bilateral hip flexion was 4/5. She noted no pain relief so far after the March 7 procedure. They recommended a right hip injection to address her complaint of hip pain. (Tr. at 855.) They provided an early refill of Norco but warned plaintiff she had to take medication as prescribed. They also provided a trial of Lyrica and a Lidoderm patch.[34] (Tr. at 856.) On April 21, they increased Lyrica and continued Norco and Lidoderm. (Tr. at 1056.)

On April 28, 2011, plaintiff went to the ER with a headache. She indicated that she had been suffering from neck pain, which radiated up into her head. (Tr. at 927.) Doctors ordered a head CT, which was normal (Tr. at 925), and provided Valium and Naproxen[35] (Tr. at 928-29).

On May 19, 2011, plaintiff saw NP Pocius and Dr. Tsoulfas for follow up of neck and back pain. (Tr. at 895, 1050.) On exam, she had tenderness over the cervical spine and bilateral trapezius muscles. Bilateral upper extremity strength was 5/5, except with bilateral hand grasps and bilateral shoulder abduction/adduction at 4/5. (Tr. at 896, 1052.) The cervical MRI from March 2011 revealed multi-level disc bulging, moderate spinal canal stenosis at C5-6, C6-7. They increased Lyrica, continued Norco and Lidoderm, and scheduled a cervical injection. (Tr. at 897, 1052-53.) On June 13 and July 11, 2011, Dr. Tsoulfas administered cervical epidural steroid injections. (Tr. at 892-93, 1103-07, 887-88, 1098-1102.)

On July 27, 2011, plaintiff went to the ER complaining of wheezing and difficulty breathing. (Tr. at 941.) Doctors ordered tests, including a chest x-ray, diagnosing bronchitis and providing Azithromycin and an Albuterol inhaler. (Tr. at 944-45.)

---

[34]Lidoderm patch is a local anesthetic, which works by stopping nerves from transmitting painful impulses to the brain. http://www.drugs.com/cdi/lidoderm-patch.html.

[35]Naproxen is an NSAID used to treat pain or inflammation. http://www.drugs.com/naproxen.html.

On August 8, 2011, Dr. Tsoulfas administered another cervical epidural steroid injection. (Tr. at 884-85, 1093-97.)[36]  On September 8, plaintiff returned to NP Pocius and Dr. Tsoulfas, reporting that since her last visit the pain improved temporarily for one day.  With current medication, she admitted improvement in activities of daily living.  (Tr. at 881.)  They continued Lyrica, Norco, and Lidoderm.  (Tr. at 883, 1048.)  They also recommended cervical MBBs, but plaintiff was about to have hernia surgery so they held off as she would not be able to lie on her stomach for awhile.  (Tr. at 882, 1048.)

On September 9, 2011, Dr. Lief Erickson performed ventral hernia repair surgery, which plaintiff tolerated well.  She discharged on September 12 with a prescription for Oxycodone for post-op pain management.  On September 30, plaintiff underwent an abdominal/pelvic CT, which showed post-operative changes from the hernia repair, and no acute pelvic or abdominal findings.  (Tr. at 960-62.)

On October 6, 2011, plaintiff returned to NP Pocius and Dr. Tsoulfas, reporting that Lyrica helped her pain.  She complained of neck pain radiating down both arms but wanted to address her back pain first.  (Tr. at 878-79.)  On exam, she had tenderness over the lumbar and cervical spine, but motor strength of the upper and lower extremities was normal.  (Tr. at 879, 1043.)  They discontinued Norco, but continued Lyrica and Lidoderm and started Naproxen and MSIR.[37]  They also sought authorization for a lumbar epidural steroid injection, and provided a referral to a neurologist to evaluate headaches.  (Tr. at 880, 1044.)

On October 27, 2011, plaintiff saw Dr. Tsoulfas for follow up of her low back pain.  (Tr.

---

[36]In August 2011, plaintiff underwent cardiac testing, which was largely normal.  (Tr. at 946, 950, 953.)

[37]MSIR (Morphine) is an opioid pain medication.  http://www.drugs.com/mtm/msir.html.

at 1039.)  On exam, she had an antalgic gait.  Overall, her pain medications were helping, but she still had function limiting and persistent low back pain.  (Tr. at 1040.)  He refilled medications awaiting authorization for a lumbar epidural steroid injection.  (Tr. at 1041.)  On November 2 and December 5, 2011, Dr. Tsoulfas administered epidural steroid injections, caudal.  (Tr. at 1088-92, 1083-87.)  On December 15, plaintiff reported no lasting change in her pain since the last visit.  (Tr. at 1035.)  On exam, she had tenderness over the lumbar spine and right shoulder with reduced shoulder range of motion.  (Tr. at 1036.)  They continued Lyrica, Lidoderm, Naproxen, and Norco, and ordered a shoulder x-ray.  (Tr. at 1037-38.)

On February 9, 2012, plaintiff returned to NP Pocius for follow up.  (Tr. at 1031.)  On exam, she had tenderness over the cervical spine and right shoulder with reduced right shoulder range of motion.  NP Pocius continued Lyrica, Lidoderm, Naproxen, and Norco, again ordered a right shoulder MRI and x-ray, and provided an order for a cane.  (Tr. at 1033-34.)  A March 6, 2012, MRI of the right shoulder revealed a possible SLAP tear involving the labrum with diffuse degenerative fraying, tendinosis/tendinopathy of the supraspinatus and infraspinatus tendons, tendinosis/tendinopathy of the long head of the biceps tendon, and moderate osteoarthritis.  (Tr. at 903-04, 988-89.)  Shoulder x-rays showed degenerative changes at the AC joint.  (Tr. at 907, 990.)

On March 7, 2012, Dr. Pastika performed tests based on plaintiff's complaints of epigastric pain, diagnosing nodular erosive gastritis, probably anti-inflammatory drug or Aspirin induced.  (Tr. at 992.)  He recommended discontinuing NSAIDs.  (Tr. at 992-93.)

On March 9, 2012, plaintiff returned to NP Pocius and Dr. Tsoulfas for follow up of low back and right shoulder pain.  (Tr. at 1027.)  On exam, she had tenderness over the cervical spine and right shoulder.  Bilateral upper extremity strength was 5/5 except bilateral hand

grasps were 4/5. Her balance and coordination were intact. (Tr. at 1029.) They continued Lyrica, Lidoderm, Naproxen, and Norco, and recommended cervical, lumbar, and right shoulder injections. (Tr. at 1029-30.) On April 19, 2012, Dr. Tsoulfas administered an epidural steroid injection at C-7/T-1. (Tr. at 1078-82.)[38]

On May 7, 2012, plaintiff saw Dr. Tsoulfas for follow up of neck pain and headaches. She noted numbness in both hands and weakness in her bilateral upper extremities. (Tr. at 1023.) On exam, her cervical range of motion was moderately reduced, and she had pain with flexion and extension. Her gait was antalgic. She was scheduled for a cervical epidural steroid injection and medications were refilled. (Tr. at 1025.) Dr. Tsoulfas performed the injection at C7-T1 on May 9, 2012. (Tr. at 1073-77.)

On May 24, 2012, plaintiff saw NP Pocius and Dr. Tsoulfas for follow up of her neck pain. Since the last visit, her pain improved temporarily. (Tr. at 1019.) On exam, she had tenderness over the cervical and lumbar spine, mild paraspinal muscle spasm at the base of the cervical spine, and mild swelling of the cervical spine. (Tr. at 1020.) They renewed medications – Lyrica, Lidoderm, Naproxen, and Norco – and scheduled cervical MBBs. (Tr. at 1021-22.) On June 20 and July 16, 2012, Dr. Tsoulfas performed cervical medial branch blocks (Tr. at 1063-67, 1068-72, 1111-13), and on August 20, radio-frequency neurolysis in the right C3-4, C4-5 area (Tr. at 1058-62, 1108-10).

On August 22, 2012, plaintiff went to the ER complaining of pain and numbness of the bilateral upper extremities, worse over the past two weeks and unimproved after a neck injection at the pain clinic. (Tr. at 1004.) She discharged home, her condition unchanged, with

---

[38]X-rays of the knees taken in April 2012 showed mild arthritis. (Tr. at 905, 909.)

a prescription for Prednisone and Oxycodone.  (Tr. 1007.)

On September 5, 2012, plaintiff returned to Dr. Tsoulfas.  (Tr. at 1017.)  On exam, she had moderately reduced cervical range of motion, and pain with extension and flexion.  Her medications continued to help with no reported side effects.  He refilled Lyrica, Naproxen, Lidoderm, and Norco.  (Tr. at 1018.)

On October 3, 2012, plaintiff saw NP Pocius and Dr. Tsoulfas for follow up of her neck and back pain.  She noted increased neck pain and had an appointment to see a surgeon the following week.  (Tr. at 1014.)  On exam, she had tenderness over the cervical and lumbar spine, and her balance was unsteady.  They prescribed Lyrica, Lidoderm patch, and Norco. They held off on further injections until after she saw the surgeon. (Tr. at 1015.)[39]  The record does not contain a report of a surgical consultation.

## C.    Procedural History

### 1.    Plaintiff's Applications and Supporting Materials

On May 5, 2010, plaintiff filed the instant applications for DIB and SSI, alleging a disability onset date of January 15, 2008.  (Tr. at 215, 222.)  The SSA employee who assisted with the filing noted that plaintiff had some problems answering questions and recalling information.  She also stood during parts of the interview due to pain and fidgeted while sitting for extended periods.  She was slow to rise from the chair and walked with a slight limp.[40]  (Tr.

---

[39]A November 1, 2012, drug test collected by Advanced Pain Management showed the presence of THC, but did not detect Fentanyl, Nortriptyline, and Naproxen.  (Tr. at 1114-16.)

[40]During a second interview in October 2010, the employee observed that plaintiff appeared to be in great pain, could not sit, stand, or walk without great discomfort, and cried often during the interview.  She had to keep standing and sitting to try to get comfortable and had trouble concentrating due to pain.  (Tr. at 265.)

at 239.)

In her disability report, plaintiff listed impairments of diabetes, thyroid cancer, arthritis, depression, and chronic pain. She reported a height of 5'3" and weight of 200 pounds. (Tr. at 242.) She indicated that she stopped working on January 31, 2008 "[b]ecause of other reasons." (Tr. at 243.) "I was missing too much work and also work was slow. I had health issues and also have a disabled child who required medical treatments." (Tr. at 243.) She reported completing two years of college and receiving CNA certification in 1999 and LPN certification in 2004. (Tr. at 243.) She listed work as a bartender from 9/06 to 12/06 and 7/07 to 1/08; as a self-employed child-care provider from 2006 to 2007; as a nurse graduate in a nursing home from 2004 to 2005; and as a CNA in 1999. (Tr. at 244.)

In her function report, plaintiff indicated that she woke up with chronic pain, usually by 3:00 a.m. She moved from her sofa to a recliner with her heating pad. She then got up, brushed her teeth, woke her kids for school, and made herself a bowl of cereal. By this time she was in so much pain she had to lay down and connect herself to her TENS unit and watch TV. She would make a sandwich for lunch and try to wash a few dishes. Her children would warm up dinner. She would ice or heat her back and watch TV. Her kids would go to bed, and she would sleep downstairs on the couch because she could not get up and down the stairs. At 10:00 p.m. she would turn off the TV and try to go to sleep. (Tr. at 255.)

In a physical activities addendum, plaintiff reported chronic pain that prevented her from walking, bending, standing, and sitting. She reported that she could continuously sit, stand, or walk for 10 minutes. (Tr. at 256.) Her sisters helped her to clean and shop. She also reported difficulty dressing and bathing. (Tr. at 257.) She made sandwiches and frozen dinners (which her sisters prepared). She tried to wash a few dishes and wipe the counters.

Her sisters came to help clean and do laundry. (Tr. at 258.) She tried to get out two to three times a week, which she could do alone, driving or riding in a car. She was able to shop in stores, and it took her about ten minutes. Her mother reminded her of bills because she was forgetful. (Tr. at 259.) Her hobbies included watching TV and spending time with her children. Before her illness, she loved to fish but no longer would get down to the river or stand for long periods of time. Regarding social activities, her siblings came over weekly, and she spoke to her mother on the phone daily. (Tr. at 260.) She reported no problems getting along with others but did not socialize outside of her family due to pain and depression. She reported that she could not sit, stand, bend, walk, climb, or kneel due to pain in her back and legs. She also had ADHD, which affected her concentration. She could walk no more than one block before needing to stop and rest. She followed written instructions okay, and verbal instructions okay so long as it was done within a few minutes. (Tr. at 261.) She got along with authority figures and had never been fired from a job because of problems getting along with others. She did not handle stress or changes in routine well. (Tr. at 262.) She concluded that her condition had gotten worse. In 2004, she graduated from nursing school. Her illnesses had kept her so down that she could not focus physically and mentally on trying to take and pass the state board nursing testing. She also had bad migraine headaches, and due to depression and pain was unable work.[41] (Tr. at 263.)

---

[41]In a later function report completed in January 2011, plaintiff reported that she could not sleep more than two hours before she woke up due to pain. At 5:30 a.m., she woke up her daughter for school, let the dog out, washed her face and brushed her teeth. Her daughter made her toast, and she took her medications. She then laid down on a heating pad and watched TV. She would get up and make herself a bowl of soup for lunch, then lay down and watch more TV. Her daughter made dinner, then more TV and by 9:00 p.m. she would go to bed and try to sleep. (Tr. at 278.) Her children took care of the dog, and her sisters helped prepare meals. She reported difficulty washing and dressing due to trouble bending. (Tr. at

## 2.     SSA Review

The agency arranged for plaintiff's claim to be evaluated by medical and psychological consultants.  On August 10, 2010, David Kamper, M.D., reviewed the evidence and completed a physical RFC assessment, finding plaintiff capable of light work.  (Tr. at 632-39.)  On August 11, 2010, Joan Kojis, Ph.D., completed a psychiatric review technique report, finding no severe mental impairment.  (Tr. at 640-52.)  Dr. Kojis indicated that plaintiff's therapy and treatment appeared to be limited to coping with life stressors rather than a mental illness.  (Tr. at 652.)  On February 24, 2011, Janis Byrd, MD, completed a physical RFC report, also finding plaintiff capable of light work.  (Tr. at 824-32.)  On the same date, Deborah Pape, Ph.D. completed a psychiatric report, finding no severe mental impairment.  (Tr. at 834-46.)

Based on these reports, the SSA denied the applications initially on August 12, 2010 (Tr. at 126-27, 130, 134), and on reconsideration on February 25, 2011 (Tr. at 128-29, 138, 142.) Plaintiff then requested a hearing before an Administrative Law Judge ("ALJ").  (Tr. at 147.)

## 3.     ALJ Hearing

On September 25, 2012, plaintiff appeared for her hearing, but the ALJ adjourned the proceeding to give her more time to prepare and obtain counsel.  (Tr. at 41-58.)  She returned on January 24, 2013, with counsel for her hearing.  The ALJ also summoned a vocational expert ("VE").  (Tr. at 59.)  At the outset of the hearing, the ALJ clarified the periods under

_____

279.) She tried to do some housework but her children and sisters did most of it.  (Tr. at 280.) She went out about twice per week but did not drive because of her pain medications.  (Tr. at 281.)  In a physical activities addendum, she reported being able to continuously sit for five to 10 minutes, stand for five minutes, and walk three to five minutes.  She could do these things in total for one hour per day.  (Tr. at 285.)  She concluded that her health had gotten much worse since her initial filing.  Her pain medication had been increased and she was scheduled for a second nerve burning.  (Tr. at 286.)

review: from January 15, 2008 (the alleged onset date) to June 30, 2009 (the date last insured for purposes of DIB), and the period after the date last insured during which her condition may have changed.  (Tr. at 63.)

Plaintiff testified that she was 47 years old, with a high school level education and additional certificates as an LPN and CNA.  (Tr. at 65.)  She was divorced with two children, ages 19 and 15.  (Tr. at 65-66.)  Plaintiff indicated that she lived with and was able to care for her children when they were minors.  (Tr. at 66.)  Plaintiff testified that she had not worked in any capacity since January 15, 2008.  (Tr. at 67.)  She had a driver's license and was able to drive (Tr. at 67-68), but indicated that she did not drive because of issues with her neck, turning her head, and the side effects of her medication (Tr. at 95).

The ALJ asked plaintiff to describe a typical day during the January 2008 to June 2009 time period, but plaintiff stated she could not remember.  (Tr. at 68.)  The ALJ then asked about her daily activities from June 2009 forward.  Plaintiff testified that she would get up, then move to a recliner or the sofa.  She testified that she had become a couch potato, watching television, reading, and nodding off every now and then.  (Tr. at 69, 81.)  She attributed her inactivity to discomfort, referencing bulging discs in her neck and back.  (Tr. at 70.)  She received injections, which helped temporarily.  She also took medication and used ice and heat throughout the day, which helped.  (Tr. at 71, 94-95.)  She testified that she always took her medications as prescribed.  (Tr. at 72.)  Her narcotic pain medications helped with the pain. She had been prescribed physical therapy, but it caused more pain.  (Tr. at 73.)  She had also been referred to surgeons but could not go because of issues with her insurance.  (Tr. at 74, 95.)  She testified that her medications caused side effects, making her feel nauseated, drowsy, and loopy.  (Tr. at 77.)  She had tried a pain patch, but it made her sick so it was

38

discontinued.  (Tr. at 79.)  She also wore a back brace off and on throughout the day.  (Tr. at 107.)

Plaintiff testified that she could cook but did not clean her home due to pain.  (Tr. at 80.)  She was incapable of shopping because she could not handle the walking involved.  (Tr. at 80-81.)  She could not do laundry because of the weight and the bending.  (Tr. at 81.)  She needed help with bathing and dressing since 2010.  (Tr. at 108-09.)  She testified to trouble reading because of blurred vision; reading glasses helped but caused headaches.  (Tr. at 82.)  She was able to follow along with a television program if paying attention.  (Tr. at 82-83.)

Plaintiff testified that she got along with her family and had friends, who sometimes dropped by.  (Tr. at 83.)  She indicated that her mental health interfered with her ability to work.  (Tr. at 84.)  She saw a psychologist off and on for 15 years, last in the fall of 2012.  (Tr. at 84-85.)  She estimated that she had seen Dr. Caufield 50 times in the past five years, but the ALJ doubted that the medical records substantiated that and noted that the records from Dr. Caufield ended in May 2010.  (Tr. at 85.)  Plaintiff testified to diagnoses of ADHD, depression, and anxiety, for which she talked to a psychologist.  (Tr. at 86.)  He helped her with coping strategies.  (Tr. at 87.)  She testified that she also took medications (Alprazolam), which she received from a nurse practitioner, who took over for her psychiatrist, Dr. Pierce.  (Tr. at 87-88, 89.)  The medications helped.  (Tr. at 90.)  The ALJ asked about plaintiff's November 2012 urine test, which showed low levels of THC (Tr. at 92), then asserted that using marijuana was not compliant with medication (Tr. at 93).

Plaintiff testified that she also had problems with her knees, which swelled up, for which she used ice and elevated her legs above her heart.  (Tr. at 96.)  She had to stand up twice during the hearing because of problems sitting.  She indicated that had been going on for about

two years.  (Tr. at 96-97.)  She initially stated she did not have this problem sitting in 2008 and 2009, but then retracted that statement, indicating it had been going on longer.  (Tr. at 98-99.) She stated that she could only stand for five minutes, and that had been the case for several years.  She testified this was a problem prior to 2010, when she had cancer surgery.  (Tr. at 100-01.)  The ALJ asked why she had not stated that earlier in response to his questions, and she indicated that she got confused.  (Tr. at 102.)  She testified that her lifting difficulties had gotten worse; she could now barely lift a gallon of milk.  She had been using a cane for about a year.  (Tr. at 103.)

Plaintiff testified that she obtained medical treatment through BadgerCare.  (Tr. at 109.) She testified that she no longer used marijuana.  It helped with her pain, but her pain management provider told her it was illegal and she could not use it.  (Tr. at 109-10.)

The ALJ then turned to the VE, who classified plaintiff's past employment as an LPN as medium, skilled work; as a nursing assistant as medium, semi-skilled work; as a child-care worker as light, semi-skilled work; and as a bartender as light, semi-skilled work.  (Tr. at 112.) The ALJ and plaintiff's counsel suspected that only the LPN and CNA jobs qualified as SGA. (Tr. at 113-14.)

The ALJ then asked a hypothetical question, assuming a person of plaintiff's age and experience, capable of light work but unable to perform overhead tasks more than occasionally. (Tr. at 116.)  The VE testified that such a person could not perform the past SGA positions but could do others jobs, such as sales attendant, companion, and information clerk.  (Tr. at 117.) The ALJ then asked a second hypothetical, assuming a person unable to lift and carry more than 10 pounds; unable to stand and walk more than two hours in an eight-hour day; requiring a sit/stand option at will; unable to climb ladders, ropes and scaffolds; unable to perform

overhead tasks more than occasionally; unable to climb stairs, balance, stoop, kneel, crouch, or crawl more than occasionally; using a cane to ambulate; and unable to maintain the attention or concentration necessary to perform detailed or complex tasks. (Tr. at 118.) This person also could not perform the past work but could do other jobs including order clerk and surveillance system monitor. (Tr. at 118-19.)

### 4. ALJ's Decision

On March 27, 2013, the ALJ issued an unfavorable decision. (Tr. at 8.) The ALJ concluded that plaintiff remained insured for DIB purposes through June 30, 2009, but that she had not been under a disability since January 15, 2008, the alleged onset date, through the date of decision. (Tr. at 11.) The ALJ then proceeded through the five-step process for evaluating disability claims.

At step one, the ALJ determined that plaintiff had not engaged in SGA after January 15, 2008, the alleged onset date. At step two, the ALJ found that plaintiff suffered from the severe impairments of history of thyroid cancer status post surgeries, back disorder, facet arthropathy of the lumbar spine, obesity, diabetes, status post hernia repair, status post knee sprain, and shoulder injuries. The ALJ found plaintiff's reported heart symptoms and hernia non-severe. (Tr. at 13.) Cardiac testing had been normal, and the hernia was repaired with no evidence of any post-operative complications or recurrence. (Tr. at 13-14.) The record contained references to fibromyalgia, but there was no objective evidence to substantiate that this was a medically determinable impairment. For example, an exam in February 2008 showed only four trigger points, such that she did not meet the criteria for a diagnosis of fibromyalgia.[42] (Tr.

_____

[42]As indicated earlier, the rule of thumb for fibromyalgia is that the person must have at least 11 of 18 tender spots. Sarchet, 78 F.3d at 306.

at 14.) The ALJ further found that plaintiff's affective and anxiety disorders caused no more than minimal limitation in her ability to work. The ALJ noted that she had not pursued long-term mental health treatment since the alleged onset date, and that what treatment she did obtain focused primarily on couple's counseling rather than mental health symptoms that would limit her ability to work. She admitted at the hearing that she had mental health treatment off and on for 15 years, had not had any psychiatric treatment in a long time, and had not seen her treating nurse for about six months or more. The ALJ concluded that this pattern and infrequent treatment strongly suggested that her symptoms were not that bothersome. (Tr. at 14.)

The ALJ then turned to the four broad functional areas set forth in the regulations for evaluating mental disorders, finding mild limitation in activities of daily living. Plaintiff admitted in her function report that she sustained a variety of activities, including caring for her disabled child, completing her personal care independently, preparing meals a couple times per week, doing some light housework, driving, and shopping in stores. During treatment, she related working part-time, spending time with family, kayaking, fishing, camping, and biking, although she later reported discontinuing some of those activities. The ALJ also found mild limitations in social functioning. Plaintiff reported socializing less, but she admitted that she still went out regularly and could go out alone. She also reported no problems getting along with others. In the area of concentration, persistence, and pace, the ALJ also found mild limitations. Plaintiff reported having a short attention span but was able to pay attention to sustain her daily activities, and the record did not indicate any change in her ability to pay attention since she stopped working or attended school full-time. She described some problems with stress, but the record suggested this was due to marital and housing problems. She also admitted that

42

she had no problem understanding or following instructions. (Tr. at 14.) Finally, the ALJ found

that plaintiff had experienced no episodes of decompensation. (Tr. at 15.)

At step three, the ALJ found that plaintiff did not have an impairment or combination of

impairments that met or medically equaled a Listing. The ALJ considered the effect of

plaintiff's obesity, with a height of 5'3" and weight of 200 pounds. The ALJ noted that no

treating or examining physician mentioned findings equivalent in severity to the criteria of any

listed impairment, nor did the medical evidence show medical findings the same or equivalent

to those of any listed impairment. (Tr. at 15.)

The ALJ then determined that prior to June 30, 2009, the date last insured, plaintiff

retained the RFC to perform light work, except that she was unable to perform overhead tasks

more than occasionally. In making this finding, the ALJ considered plaintiff's alleged symptoms

and the medical opinion evidence. (Tr. at 15.)

The ALJ first summarized plaintiff's claims. Plaintiff alleged that her symptoms became

disabling on January 15, 2008. At the hearing, she could not recall her daily activities prior to

the date last insured, though she alleged that her health issues caused her to miss too much

work and work at a slow pace. She also alleged that she could only sit, stand, or walk for 10

minutes at a time. She further alleged having problems lifting and climbing stairs, as well as

remembering and completing tasks. (Tr. at 16.)

The ALJ then stated:

> After careful consideration of the evidence, the undersigned finds that the
> claimant's medically determinable impairments could reasonably be expected to
> cause the alleged symptoms; however, the claimant's statements concerning the
> intensity, persistence and limiting effects of these symptoms are not entirely
> credible for the reasons explained in this decision.

(Tr. at 16.) The ALJ provided several reasons for his finding. First, he noted that while plaintiff

43

reported not working since the alleged onset date, subsequent information revealed that this is not true. "The fact that the claimant provided inaccurate information on a matter so integral to determining disability suggests that much of what the claimant has alleged may be similarly unreliable." (Tr. at 16.) Treatment notes consistently indicated that plaintiff continued to work part-time, a couple days per week, as a bartender until sometime in late 2009 or early 2010. Second, plaintiff reported other activities inconsistent with her allegations, such as spending time renovating a house, caring for her disabled child, and babysitting. (Tr. at 16.) Third, the ALJ noted that when she was not working plaintiff actively looked and applied for work. For example, in May 2008, she reported working on weekends and looking for more permanent work. She similarly reported looking for work in July 2008 and thereafter. The ALJ concluded that this strongly suggested that plaintiff herself felt she could work, but that her problem was finding a job. "However, the inability to find work is not the same thing as being disabled." (Tr. at 16.)

Fourth, the ALJ noted that review of plaintiff's employment history showed that she worked only sporadically prior to the alleged onset date, which raised a question as whether her continued unemployment was actually due to the medical impairments. She described herself during treatment as a homemaker and also indicated she had a son with severe medical problems. (Tr. at 16.)

Fifth, the ALJ noted that plaintiff's medical treatment prior to the date last insured was conservative and did not document complaints of symptoms that she now alleged were totally disabling. Treatment notes consistently reflected no mention of back pain, and she regularly took no pain medication other than over-the-counter ibuprofen. She also failed to follow diabetes treatment recommendations and did not quit smoking as recommended. She had

headaches off and on, but without any evidence of change in the frequency or severity after she stopped working.  What medications she was prescribed, she did not take consistently. Physical therapy was recommended for her neck and headaches, but she canceled and failed to appear for all but a few appointments.  She complained that her weight interfered at times, but there was no evidence of any weight gain since she sustained work at the medium level. The record also reflected some marijuana use, contrary to treatment recommendations and inconsistent with her statements.  (Tr. at 17.)  Finally, the ALJ noted that the objective testing and physical exams prior to the date last insured did not show any abnormality that would account for the severity of plaintiff's alleged problems walking, sitting, and other alleged limitations.  For example, in July 2008, her back and extremities examinations were entirely negative – no restricted range of motion, tenderness, swelling, weakness, or other documented abnormality.  (Tr. at 17.)

As for the opinion evidence, prior to July 1, 2009, the record contained no opinions from treating or examining sources indicating that plaintiff was disabled or had greater limitations than the ALJ found.  Review of the record revealed no restrictions recommended by a treating doctor, contrary to what one would expect given plaintiff's allegations of disabling symptoms. (Tr. at 17.)  The ALJ placed significant weight on the opinions of the state agency consultants, who found that plaintiff's mental impairment was non-severe, with her symptoms related to stress caused by family issues rather than a mental impairments, and that she could sustain light work, with the degree of limitation alleged quite extreme compared to the physical evidence.  The ALJ accordingly concluded that, prior to July 1, 2009, plaintiff could sustain light work with no more than occasional overhead tasks.  (Tr. at 17.)

Beginning July 1, 2009, after the date last insured, the ALJ found that plaintiff retained

the RFC for sedentary work with additional restrictions: unable to lift/carry more than 10 pounds, unable to stand/walk more than two hours, and needing a sit/stand option.  She was also unable to climb ladders, ropes, or scaffolds.  She was unable to perform overhead reaching, climb stairs, balance, stoop, kneel, crouch, or crawl more than occasionally.  (Tr. at 17.)  She used a cane to ambulate.  (Tr. at 17-18.)  Finally, due to pain, she was unable to maintain the attention and concentration necessary to perform detailed or complex tasks.  (Tr. at 18.)

In making this finding, the ALJ again considered plaintiff's alleged symptoms and the medical evidence.  Regarding the former, he indicated that plaintiff's statements concerning the effects of her symptoms were "not entirely credible prior to July 1, 2009, for the reasons explained in this decision."  (Tr. at 18.)  He then noted that the record did reflect additional medical treatment since July 1, 2009, which was generally successful in controlling those symptoms.  For example, in October 2009, plaintiff complained of some lower back and extremity symptoms but stated they were only mild to moderate severity.  She still considered them moderate in May 2010.  After complaining of increased pain and decreased standing and walking tolerance, she pursued radio-frequency treatment, reporting 50-75% improvement with no side effects.  Her hernia was repaired in 2011 without complication.  (Tr. at 18.)  The ALJ also noted that plaintiff underwent surgery for thyroid cancer in 2010, with no evidence of post-operative complications or residual symptoms that would cause additional restrictions.  The objective medical evidence was also unremarkable for any abnormality that would cause greater limitation.  For example, a September 2009 EMG showed no evidence of neuropathy in her lower extremities.  Plaintiff also complained of upper extremity symptoms that were unexplained by any objective evidence.  A lumbar MRI showed objective changes, but not of

the severity that would preclude sedentary work allowing for position changes and use of a cane. Right hip x-rays showed only mild changes, and a cervical MRI also did not show any abnormality to account for upper extremity symptoms. Right shoulder x-rays were consistent with being able to perform occasional overhead work. She retained 5/5 strength in her upper extremities with 4/5 bilateral hand grasp. Her physical exams showed that her balance and coordination were intact, and her knee x-rays showed only mild arthritis, suggesting that she would be able to tolerate the occasional postural movements described in the RFC. (Tr. at 19.)

The ALJ also noted that plaintiff continued to cancel or fail to attend doctor appointments. She canceled a sleep study, failed to show for physical therapy appointments, and at times failed to take prescribed medications. The ALJ concluded that plaintiff's failure to consistently pursue treatment strongly suggested that her symptoms were not as severe as alleged. (Tr. at 19.)

As for the opinion evidence, the record again failed to include restrictions recommended by treating doctors. For this period, the ALJ gave some weight to the state agency consultants, finding that subsequent evidence supported a limitation to a range of sedentary work. (Tr. at 19.)

At step four, the ALJ concluded that plaintiff could not perform her past relevant work as a nurse assistant and licensed practical nurse, as those were medium level occupations. (Tr. at 20.) At step five, relying on the VE's testimony, the ALJ concluded that prior to July 1, 2009, plaintiff could perform other jobs, such as sales attendant, companion, and information clerk. Beginning July 1, 2009, the ALJ found that plaintiff could perform as an order clerk and surveillance system monitor. (Tr. at 21.) The ALJ accordingly found plaintiff not disabled at any time through the date of decision. (Tr. at 22.)

**5. Appeals Council**

Plaintiff sought review of the ALJ's decision by the Appeals Council. In her brief, she addressed only the SSI portion of the claim, conceding that she was not disabled prior to the date last insured. (Tr. at 314.) On May 22, 2014, the Appeals Council denied plaintiff's request for review (Tr. at 1), making the ALJ's decision the final word from the Commissioner on plaintiff's applications. See Minnick v. Colvin, 775 F.3d 929, 935 (7th Cir. 2015). This action followed.

## II. DISCUSSION

In this court, plaintiff argues that the ALJ failed to consider all of her impairments, made an improper credibility determination, failed to properly evaluate the Listings, and made an improper RFC determination. I address each contention in turn.

**A. Severe Impairments**

Plaintiff first argues that the ALJ failed to properly evaluate all pertinent severe impairments at step two, thus impacting his RFC and credibility findings. Specifically, plaintiff contends that the ALJ omitted her chronic neck pain, headaches, and hip pain. While the ALJ mentioned test results regarding these impairments later in his decision, he failed to explain why they were not severe at step two.

As the parties recognize, the step two determination is merely a threshold requirement. See, e.g., Curvin, 778 F.3d at 648. So long as the ALJ finds at least one severe impairment and continues with the sequential evaluation, any error at step two is harmless if the ALJ properly considers all of the claimant's impairments, severe and non-severe, when determining RFC. Id. at 649.

Plaintiff contends that the ALJ failed to include the effects of these additional impairments in his questions to the VE and in the RFC determination. For example, she contends that her neck and hip pain reduce her ability to sit as required for sedentary work, and her headaches interfere with her ability to maintain the focus and concentration needed for work. (Pl.'s Br. at 9-10; Pl.'s Reply Br. at 4.) However, she cites no evidence supporting any specific restrictions attributable to these impairments beyond those adopted by the ALJ. She cites a note in which she told Dr. Caulfield (her psychologist) that cold, dark, and quiet seemed to work best in relieving her headaches (Tr. at 531), but Dr. Caulfield made no finding that she required any specific accommodations and issued no restrictions based on headaches. That plaintiff reported these impairments to her doctors and received treatment for them, as plaintiff details in her brief (Pl.'s Br. at 8-9), does not establish that the ALJ erred in determining impairment severity.[43] See Anglemyer v. Colvin, No. 12-CV-486, 2014 U.S. Dist. LEXIS 45206, at *22 (N.D. Ind. Apr. 2, 2014) ("[T]he diagnosis of an impairment does not establish the severity of the impairment and its resulting limitations.") (citing Estok v. Apfel, 152 F.3d 636, 639 (7th Cir. 2004)).

Plaintiff also faults the ALJ for finding her mental impairment non-severe. Specifically, she takes issue with the ALJ's statement that she had not pursued long-term mental health treatment since the alleged onset date, that what treatment she did obtain focused primarily on couple's counseling rather than mental health symptoms that would limit her ability to work,

---

[43]The ALJ did not skip the neck disorder, hip pain, and headaches when it came time to write the decision, as plaintiff alleges. (Pl.'s Reply Br. at 2.) He discussed each of these impairments, noting that the cervical MRI showed no abnormality to account for upper extremity symptoms and upper extremity strength was generally normal (Tr. at 19); right hip x-rays showed only mild changes (Tr. at 19); and the record showed no change in frequency and severity of headaches since plaintiff stopped working (Tr. at 17).

and that the infrequent treatment strongly suggested that her symptoms were not that bothersome. (Tr. at 14.) Plaintiff contends that the longitudinal record shows treatment dating back to 2008, with reports of decreased motivation, poor focus, mood swings, forgetfulness, and crying spells, and with her providers trying various different medications. (Pl.'s Br. at 10-11.) She further notes that most of her treatment was individual, not with her husband. (Pl.'s Br. at 11.) Finally, she faults the ALJ for failing to consider possible reasons for lack of treatment, such as her insurance problems in early 2009, and notes that, in any event, evidence of psychiatric treatment is not necessary to prove a severe mental impairment. (Pl.'s Br. at 11-12.)

Again absent from plaintiff's discussion, however, is any evidence of specific restrictions related to mental impairments. She cites a July 1, 2009, note from Dr. Caulfield, in which they discussed "how her mood cycles and concentration problems have interfered with her schooling and work in the past." (Tr. at 522.) But Dr. Caulfield suggested no specific work-related restrictions. As with the physical impairments, diagnosis alone is insufficient as a basis for evaluation of the severity of mental impairments. Orlando v. Heckler, 776 F.2d 209, 214 (7th Cir. 1985). Plaintiff also overlooks the ALJ's further discussion of the four broad functional areas related to mental impairments (Tr. at 14-15), his finding that plaintiff could not maintain the attention and concentration needed to perform detailed or complex tasks (Tr. at 18), his notation that no treating or examining physician provided for greater restrictions, and his reliance on the state agency consultants' finding of no severe mental impairment (Tr. at 17).[44]

---

[44]I address the insurance issue in the next section.

**B. Credibility**

Plaintiff next faults the ALJ for using boilerplate credibility language, i.e., that while plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," her "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible" for the reasons explained in the decision (Tr. at 16, 18.) I first note that the ALJ did not use the full credibility "template" criticized by the Seventh Circuit.[45] The ALJ's "not entirely credible" language is unhelpful, see, e.g., Bjornson v. Astrue, 671 F.3d 640, 645 (7th Cir. 2012), but in this case harmless because the ALJ went on to provide specific reasons for his finding, see, e.g., Moore v. Colvin, 743 F.3d 1118, 1122 (7th Cir. 2014); Filus v. Astrue, 694 F.3d 863, 868 (7th Cur. 2012).

As indicated above, after summarizing plaintiff's claims,[46] the ALJ provided several reasons for discounting plaintiff's testimony, but plaintiff takes issue with each of them. First, the ALJ found that plaintiff had been untruthful about her work history; despite claiming that she had not worked since the alleged onset date, the medical records contained notations that plaintiff continued to work part-time as a bartender in 2009 and 2010. (Tr. at 16.) Plaintiff does not dispute this but faults the ALJ for failing to question her about this discrepancy before using

---

[45]The full template indicates that the claimant's statements "are not credible to the extent they are inconsistent with the above residual functional capacity assessment." E.g., Cunningham v. Colvin, No. 14-C-420, 2014 U.S. Dist. LEXIS 164005, at *16 (E.D. Wis. Nov. 24, 2014). The biggest problem with this language is that it backwardly implies that the ability to work is determined first and is then used to determine the claimant's credibility, rather than factoring the testimony into the RFC determination. E.g., Shauger v. Astrue, 675 F.3d 690, 696 (7th Cir. 2012). The ALJ did not make that mistake here.

[46]Plaintiff faults the ALJ for not considering all of the reported limitations in her hearing testimony and written reports (Pl.'s Br. at 14-15), but the ALJ does not have to discuss every piece of evidence in the record. E.g., Pepper, 712 F.3d at 362.

it as a factor against her.[47]  However, the case she cites, <u>Murphy v. Colvin</u>, 759 F.3d 811, 817 (7th Cir. 2014), does not support her argument.  In <u>Murphy</u>, the ALJ found the claimant less than credible because she took a vacation, without determining what she did on that vacation or explaining how her alleged symptoms were inconsistent with her ability to take a vacation. <u>Id.</u>  Here, the ALJ pointed to facially inconsistent statements regarding plaintiff's work history, which are appropriately considered in evaluating credibility.  <u>E.g.</u>, <u>Gully v. Colvin</u>, 593 Fed. Appx. 558, 563 (7th Cir. 2014).

Second, the ALJ found that plaintiff engaged in activities inconsistent with her allegations, including renovating a house, caring for her disabled child, and babysitting.  As plaintiff notes, the ability to perform daily activities, especially if that can be done only with significant limitations, does not necessarily translate into the ability to work full-time.  <u>Roddy v. Astrue</u>, 705 F.3d 631, 639 (7th Cir. 2013).  The ALJ also failed explore how long these activities took or to explain how they undercut any of plaintiff's specific claims.  If this had been the only reason the ALJ provided, I would likely be obliged to remand.  <u>See</u> <u>Halsell v. Astrue</u>, 357 Fed. Appx. 717, 722-23 (7th Cir. 2009) ("Not all of the ALJ's reasons must be valid as long as <u>enough</u> of them are, <u>see, e.g.</u>, <u>Simila v. Astrue</u>, 573 F.3d 503, 517 (7th Cir. 2009); <u>Shramek v. Apfel</u>, 226 F.3d 809, 811 (7th Cir. 2000), and here the ALJ cited other sound reasons for disbelieving Halsell.").

Third, the ALJ noted that plaintiff actively looked and applied for work after the alleged onset date, which suggested that she felt she could work but that her problem was finding a job.  Plaintiff responds that a desperate person might force herself to work despite being

---

[47]At the hearing, the ALJ asked plaintiff, "Have you worked in any capacity from your alleged onset date of 1/15/08?"  (Tr. at 67.)  Plaintiff responded, "No."  (Tr. at 67.)

disabled.  See, e.g., Wilder v. Chater, 64 F.3d 335, 337-38 (7th Cir. 1995).  However, the

Seventh Circuit has held that an ALJ may consider a claimant's representations to prospective

employers that she can work as a factor in the analysis.  Knox v. Astrue, 327 Fed. Appx. 652,

656 (7th Cir. 2009).  Here, the ALJ cited records indicating plaintiff looked for work in July 2008

and thereafter, including an October 7, 2009, note indicating that she interviewed for a job at

a group home (Tr. at 16, citing Ex. 4F/17, 531), which the ALJ could reasonably find was

inconsistent with her claims of disability from even sedentary work.

Fourth, the ALJ noted plaintiff's inconsistent work history prior to the alleged disability

onset date, which raised the question of whether her unemployment was actually due to

medical impairments.  The ALJ further noted that plaintiff described herself as a homemaker

at one point and also indicated that she had a son with severe medical problems.  (Tr. at 16.)

Plaintiff does not specifically address this point, and work history is an appropriate factor in

evaluating credibility.  McCurrie v. Astrue, 401 Fed. Appx. 145, 149-50 (7th Cir. 2010).

Fifth, the ALJ noted plaintiff's conservative treatment prior to the date last insured (Tr.

at 17),[48] the lack of significant findings in the objective evidence and the improvement she

received from her further treatment after the date last insured (Tr. at 19), and her failure to

consistently follow through with treatment throughout the periods under review (Tr. at 17-19).

Plaintiff faults the ALJ for failing to consider why she did not comply with prescribed treatment.

See Garcia v. Colvin, 741 F.3d 758, 761 (7th Cir. 2014) ("[A]n administrative law judge is not

---

[48]In reply, plaintiff faults the ALJ for stating that she had good pain control with over-the-counter Ibuprofen and discusses her use of narcotics.  (Pl.'s Reply Br. at 6.)  The ALJ relied on plaintiff's use of over-the-counter medications during the pre-date last insured period.  (Tr. at 17.)  Plaintiff's use of stronger medications and more aggressive treatment came later, as the ALJ recognized.  (Tr. at 18.)

allowed to infer from an applicant's failure to have sought medical care that he's a malingerer without asking him <u>why</u> he didn't seek care – and specifically whether he had health insurance."). The ALJ did explore plaintiff's ability to obtain treatment. At the hearing, he asked plaintiff how she paid for medical care, and she responded that she had BadgerCare through the state. He then asked, "And you've had it throughout the last five years?" She replied, "Yes, sir." (Tr. at 109.) Close review of the medical record shows that plaintiff lacked insurance coverage for certain services in early 2009 (<u>e.g.</u>, Tr. at 587, 606), but her failure to fully comply with treatment and medication spanned the entire period under review, even when she had coverage (<u>e.g.</u>, Tr. at 384, 670, 740), as the ALJ noted (Tr. at 17, 19). Plaintiff notes that by late 2010, physical therapy was no longer helping her pain (Pl.'s Br. at 17), but the ALJ noted various forms of non-compliance throughout both periods at issue.[49] (Tr. at 17, 19.)

Plaintiff faults the ALJ for failing to fully discuss the results of her EMG and cervical MRI tests, and not mentioning the observations of the SSA employees who assisted her in filing. As noted, however, the ALJ is not required to exhaustively discuss every piece of evidence; he is forbidden only from ignoring an entire line of evidence contrary to his ruling. <u>Jones v. Astrue</u>, 623 F.3d 1155, 1162 (7th Cir. 2010). Finally, plaintiff faults the ALJ for failing to specifically

---

[49]The ALJ also noted plaintiff's marijuana use, which he found inconsistent with treatment recommendations and plaintiff's testimony. (Tr. at 17.) Plaintiff contends that there is no inconsistency. Earlier in the hearing, the ALJ asked plaintiff if she was compliant with her medication, and she said she was. (Tr. at 72.) Later, after reviewing the results of a drug test revealing the presence of THC, the ALJ asserted that using marijuana was not compliant and inconsistent with her earlier testimony. (Tr. at 93.) Plaintiff contends that she truthfully testified that she was compliant with prescription medication and later truthfully admitted her past marijuana use when the ALJ specifically asked about illicit drugs. There are notations from plaintiff's pain management providers that she had to stop using marijuana while they prescribed narcotics, and that they would test her to ensure compliance. (Tr. at 790, 803.) Nevertheless, I tend to agree that the ALJ made more of this at the hearing than he should have. It played a small part of his written decision, however.

discuss the side effects of her medications, but given the absence of evidence of serious effects that would further limit plaintiff's ability to work any error was harmless. See Labonne v. Astrue, 341 Fed. Appx. 220, 225-26 (7th Cir. 2009) (rejecting argument that ALJ failed to consider medication side effects because "an ALJ is not required to provide a complete written evaluation of each piece of evidence, including the side effects of medication," and aside from the claimant's "testimony that her medications caused dizziness and drowsiness, the record contains virtually no evidence that she complained of her medications causing significant side effects").[50]

## C.    Listings

Plaintiff next notes that the ALJ found that she did not have an impairment or combination of impairments that met or medically equaled a Listing, but the ALJ specifically discussed only the mental impairment Listings, briefly mentioning obesity. See Barnett v. Barnhart, 381 F.3d 664, 668 (7th Cir. 2004) ("In considering whether a claimant's condition meets or equals a listed impairment, an ALJ must discuss the listing by name and offer more than a perfunctory analysis of the listing."). Plaintiff also faults the ALJ for failing to consider whether her combination of impairments medically equaled a closely analogous Listing. See 20 C.F.R. § 404.1526(b).

The problem with plaintiff's argument is that she makes no effort to demonstrate that she meets or equals any applicable Listing or analogous Listing. Plaintiff references her neck and hip pain, chronic headaches, and the effects of obesity on her bad knees (Pl.'s Br. at 21; Pl.'s Reply Br. at 8), but she does not relate that discussion to any specific Listing. Any error by the

---

[50]On several occasions, plaintiff reported no side effects. (E.g., Tr. at 605, 614, 1018.) When she did mention side effects, they were minor. (E.g., Tr. at 491, 585.)

ALJ in failing to say more was harmless.  See, e.g., Shafer v. Colvin, No. 13-C-929, 2014 U.S. Dist. LEXIS 61843, at * (E.D. Wis. May 5, 2014) (citing Prochaska v. Barnhart, 454 F.3d 731, 736 (7th Cir. 2004); Ramos v. Astrue, 674 F. Supp. 2d 1076, 1092 (E.D. Wis. 2009)).

In her reply brief, plaintiff cites Brindisi ex rel. Brindisi v. Barnhart, 315 F.3d 783 (7th Cir. 2003), but in that case the claimant applied for benefits under three specific Listings, id. at 785-86, and presented specific evidentiary argument as to the requirements, id. at 786.  Plaintiff does no such thing here.  Plaintiff also cites Martinez v. Astrue, 630 F.3d 693, 698-99 (7th Cir. 2011), where the court chastised the ALJ for failing to consider the impact of the claimant's extreme obesity on her knees.  Martinez was not a Listing case; in any event, the ALJ in the present case did not overlook plaintiff's obesity or her knee complaints.  He noted that while plaintiff complained that her weight interfered at times, there was no evidence of any weight gain since he was sustaining work at the medium level.  (Tr. at 17.)  He further noted that knee x-rays showed only mild arthritis, suggesting that she could sustain sedentary work with occasional postural movements.  (Tr. at 19.)  The ALJ also allowed for use of a cane to ambulate.  (Tr. at 17-18.)  Plaintiff fails to explain what other limitations the ALJ should have adopted based on her obesity and/or knee complaints.  See Skarbek v. Banrhart, 390 F.3d 500, 504 (7th Cir. 2004) (affirming where the claimant did not specify how his obesity further impaired his ability to work).

## D.    RFC/Hypothetical Questions

Finally, plaintiff argues that the ALJ failed to include certain limitations in the RFC and in his questions to the VE.  See Stewart v. Astrue, 561 F.3d 679, 684 (7th Cir. 2009) ("When an ALJ poses a hypothetical question to a vocational expert, the question must include all limitations supported by medical evidence in the record.").  She first faults the ALJ for failing

to include her need to elevate her legs due to swelling in her knees. However, the only evidence she cites regarding elevating her legs is her own testimony (Tr. at 96),[51] which the ALJ did not fully accept; she cites no medical evidence. See Zeigler v. Astrue, 576 F. Supp. 2d 982, 997 (W.D. Wis. 2008) (holding that the ALJ need not include every limitation asserted by the claimant, only those supported by the medical evidence); see also Schmidt v. Astrue, 496 F.3d 833, 846 (7th Cir. 2007) (indicating that the ALJ need only include those limitations he accepts as credible); Ehrhart v. Sec'y of HSS, 969 F.3d 534, 540 (7th Cir. 1992) (finding hypothetical question proper because it reflected the impairments supported by the medical evidence in the record).[52] Plaintiff also complains that while the ALJ accepted her knee impairment as severe, he did not include limitations related to that impairment in the RFC. That is incorrect. The ALJ specifically discussed plaintiff's knees, limiting her to sedentary work with occasional postural movements (Tr. at 19) and allowing for use of a cane (Tr. at 17-18, 118).

Plaintiff further faults the ALJ for not accounting for her time off task or the need for cold, dark, and quiet due to chronic headaches. Again, plaintiff cites no evidence that she required such limitations. As discussed above, while she reported to Dr. Caulfield that cold, dark, and quiet helped her headaches, Dr. Caulfield imposed no restrictions based on that report. The ALJ specifically considered plaintiff's headaches, finding no evidence of any change in the frequency or severity after she stopped working. (Tr. at 17.) The ALJ also found only mild

---

[51]Plaintiff testified that her knees swelled, and that she elevated them and used ice to relieve the swelling. She did not indicate how often she did that.

[52]In her reply brief, plaintiff notes that RFC must be based on the entire record, not just the medical evidence. See SSR 96-7p. The ALJ considered plaintiff's alleged limitations in sitting, standing, walking, lifting, climbing, remembering, and completing tasks, but found them less than credible. (Tr. at 16.)

limitations in concentration, persistence, and pace (Tr. at 14), which finding plaintiff does not specifically challenge. The ALJ further found that, due to pain, plaintiff could not maintain the attention and concentration needed to perform detailed or complex tasks. (Tr. at 18.) Plaintiff fails to show that more was required.

Plaintiff next complains that the ALJ did not include limitations in her use of the upper extremities related to cervical radiculopathy. (Pl.'s Br. at 23.) However, the ALJ discussed the evidence related to this condition, finding that plaintiff generally displayed good strength in the upper extremities. (Tr. at 19.) Plaintiff cites no evidence of limitations in fine manipulation, lifting, carrying, and fingering. Plaintiff contends that the ALJ also failed to account for her obesity, but that is incorrect, as discussed above.

Plaintiff further contends that the ALJ failed to perform the "function-by-function" assessment required by SSR 96-8p before expressing RFC in terms of an exertional category. (Pl.'s Br. at 24.) Plaintiff is correct regarding the pre-date last insured RFC for light work (Tr. at 15) but incorrect regarding the post-date last insured RFC for sedentary work, as the ALJ did for that period separately consider plaintiff's ability to lift/carry, stand/walk, and sit (Tr. at 17). In any event, any error on this point is harmless, as the ALJ denied this claim at step five, pre- and post-date last insured. See Wells v. Astrue, No. 07-C-940, 2009 U.S. Dist. LEXIS 7260, at *53-54 (E.D. Wis. Jan. 17, 2009); see also Knox, 327 Fed. Appx. at 657. Plaintiff contends that the ALJ pointed to no evidence that she could stand six hours or lift 20 pounds as required of light work prior to her date last insured, or perform full-time sedentary work after her date last insured (Pl.'s Br. at 24), but that is again incorrect. During the pre-date last insured period, the ALJ noted no mention of back pain in the treatment notes, no pain medication other than over-the-counter Ibuprofen, no objective testing or physical exams to

account for claimed limitations, and no restrictions from treating doctors. (Tr. at 17.) During the later period, the ALJ found that plaintiff's subsequent medical treatment supported greater limitations (Tr. at 18), but that given the success of that treatment in controlling symptoms, mild moderate in severity, she retained the ability to work full-time at the sedentary level (Tr. at 18-19). The ALJ also relied on the state agency medical consultants, who found that plaintiff could sustain light work. (Tr. at 17, 19.)

Finally, plaintiff argues that the ALJ included a sit/stand option in the RFC (Tr. at 17) but failed to specify the frequency of the transitions between sitting and standing. See SSR 96-9p ("The RFC assessment must be specific as to the frequency of the individual's need to alternate sitting and standing."). However, during his questioning of the VE, the ALJ stated that the person required a "sit/stand option at will." (Tr. at 118.) This was sufficient. See Ketelboeter v. Astrue, 550 F.3d 620, 626 (7th Cir. 2008) (rejecting the claimant's argument that the ALJ was required to describe how often he would need to change positions where the hypothetical question stated he could sit or stand "as needed"); Schmidt, 496 F.3d at 845 (rejecting same argument where the ALJ said the claimant could sit or stand at her "own option"); Lopez v. Astrue, No. 10-cv-8024, 2012 U.S. Dist. LEXIS 41302, at *26 (N.D. Ill. Mar. 27, 2012) ("A sit/stand option at will is frequently used in the Seventh Circuit, demonstrating that an 'at will' option is a sufficient specification of frequency of the individual's need."). Any error in not including the "at will" language in the RFC is harmless because the VE's response, upon which the ALJ ultimately relied, factored it in. See Jones v. Colvin, No. 10CV911, 2014 U.S. Dist. LEXIS 112742, at *15 (M.D.N.C. Aug. 14, 2014) ("[C]ourts have held that failure to specifically identify a limitation in a claimant's RFC constitutes harmless error when the hypothetical question posed to the VE included the limitation."); Box v. Colvin, No. 13CV74,

2014 U.S. Dist. LEXIS 97143, at*5 (E.D. Ark. July 17, 2014) ("Because the ALJ included the sit/stand option in the hypothetical, the failure to include it in the RFC is harmless error.").

### III.  CONCLUSION

**THEREFORE, IT IS ORDERED** that the ALJ's decision is **AFFIRMED**, and this case is **DISMISSED**.  The Clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 24th day of March, 2015.

/s Lynn Adelman
LYNN ADELMAN
District Judge